## ARGUMENT

In Franks v. Delaware, 438 U.S. 154 (1978), the Supreme Court "held that the Fourth Amendment entitles a defendant to challenge the validity of a search warrant affidavit if [he] makes a substantial preliminary showing that the affiant 'knowingly and intentionally, or with reckless disregard for the truth[,]' inserted a false statement in the warrant affidavit." United States v. Napier, 436 F.3d 1133, 1136 (9th Cir. 2006) (quoting Franks, 438 U.S. at 155-156). The "preliminary showing" that a defendant must make to be entitled to a Franks evidentiary hearing consists of establishing that the affidavit in support of the warrant "contained material misrepresentations or omissions." United States v. Gonzalez, Inc., 412 F.3d at 1102, 1110 (9th Cir. 2005) (citing United States v. Shryock, 342 F.3d 948, 977 (9th Cir. 2003), and United States v. Bennett, 219 F.3d 1117, 1124 (9th Cir. 2000)); see also United States v. Ippolito, 774 F.2d 1482 (9th Cir. 1985). The Ninth Circuit's "case law does not require clear proof of deliberate or reckless omissions or misrepresentations at the pleading stage." Gonzalez, Inc., 412 F.3d at 1111 (citing United States v. Stanert, 762 F.2d 775, 781 (9th Cir. 1985). Rather, at the pleading stage, it is only "require[d] [that] the defense ... make a substantial showing that supports a finding of intent or recklessness." Ibid. Indeed, in Gonzalez, Inc., the Ninth Circuit held that showing that, because of the affiant's "key role" in the

investigation, "he knew or should have known the veracity of the challenged statements in his affidavit" (since the statements were material to the investigation and to establishing probable cause) sufficed. Ibid.

At the Franks hearing itself, this Court's task is two-fold. The Ninth Circuit explains:

> A district court conducting a Franks hearing engages in a two-step process. First, the district court determines whether the affiant officer intentionally or recklessly made false or misleading statements or omissions in support of the warrant. Franks, 438 U.S. at 155-156; United States v. Senchenko, 133 F.3d 1153, 1158 (9th Cir. 1998). If it finds by a preponderance of the evidence that the officer so acted, the district court then inquires into whether "with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause." Franks, 438 U.S. at 156; Senchenko, 133 F.3d at 1158.

United States v. Martinez-Garcia, 397 F.3d 1205, 1215 (9th 2005)(parallel citations silently omitted).

As is explained below, the appended exhibits satisfy Bailey's preliminary obligation to show that the affidavit contains material misstatements and omissions and further support the inference that the affiant acted, at the very least, in reckless disregard of the veracity of those statements and the necessity of including the omissions. Bailey is, therefore, entitled to a Franks hearing. The attached

2

exhibits, especially when taken together with any evidence adduced at the Franks hearing, also evince that both prongs of the Franks inquiry are met in this case. The affiant recklessly, if not intentionally, included false and misleading statements in his affidavit and omitted material information; when false statements are stricken from the affidavit and the material omissions are considered, the affidavit fails to establish probable cause.

The government's single-count indictment accuses Bailey of violating 18 U.S.C. § 2252(a)(4), a statute prohibiting the possession of 'child pornography,' "on or about September 14, 2004." This charge results from the execution of a search warrant that a Magistrate Judge issued on September 10, 2004, which authorized United States Immigration and Customs Enforcement Special Agent Siave P. Iafeta to search Bailey's residence and his computers for video files. See Exhibit B (the search warrant). The Magistrate Judge issued the warrant on the basis of a 15-page affidavit that Agent Iafeta authored. See Exhibit B; see also Exhibit A (Agent Iafeta's affidavit).

In an introductory section of his affidavit, Agent Iafeta asserts: "*I* am investigating the activities of Andrew Bailey" and that "there is probable cause to believe that Bailey has distributed, and currently possesses, child pornography[.]" Exhibit A at 1, ¶ 3 (emphasis added). Agent Iafeta emphasizes that "[t]he statements

3

contained in this affidavit are based on *my own* investigative efforts or, where indicated, information provided by others." Exhibit A at 2, ¶ 4 (emphasis added).

Following the brief introductory section, is a section of "definitions." Exhibit A at 2-3, ¶¶ 5-12. As is relevant here, Agent Iafeta defines "IP address" as signifying

> a unique number used by a computer to access the Internet. IP addresses can be dynamic, meaning that the Internet Service Provider (ISP) assigns a different unique number to a computer every time it accesses the Internet. IP addresses might also be static, if an ISP assigns a computer a particular IP address, which is used each time the computer accesses the Internet.

Exhibit A at 2-3, ¶ 8. Agent Iafeta also explains that "URL" abbreviates "Uniform Resource Locator" and "refers to an Internet address." Exhibit A at 3, ¶ 11. According to Agent Iafeta, "[e]ach file on the Internet has a unique address called a Uniform Resource Locator, more commonly known as URL." Ibid.

Following the definitions section is a section setting forth numerous general assertions profiling the "use of computers with child pornography." Exhibit A at 3-6, ¶¶ 13-25. This section attempts to explain how some "[c]ollectors and distributors of child pornography" have resorted to using "peer to peer filing sharing (P2P)" to collect and trade computer files containing videos and photographs depicting child pornography. In essence, this section describes how computer users

4

using "special software" can create a "network" over which they can share digital files. Agent Iafeta generally relates how a user can share and obtain a file using P2P software as follows:

> Computers linked together through the Internet using this software form a network that allows for the sharing of digital files between users on the network. A user first obtains the P2P software, which can be downloaded off the Internet. In general, P2P software allows the user to set up file(s) on a computer to be shared with others running compatible P2P software. A user obtains files by opening the P2P software on the user's computer, and conducting a search for files that are currently being shared on the network. Some types of P2P software allow searches to be done by keyword. The results of the keyword search are displayed to the user. The user then selects the file(s) from the results for download. The download of a file is achieved through a direct connection between the computer requesting the file and the computer containing the file.

Exhibit A at 5, ¶ 21.

As for identifying any particular sharer or downloader, Agent Iafeta noted that

> [a] P2P file transfer is assisted by reference to an Internet Protocol (IP) address. This address, expressed as four numbers separated by decimal points, is unique to a particular computer during an online session. The IP address provides a unique location making it possible for data to be transferred between computers.

Exhibit A at 6, ¶ 24. "Software is available," Agent Iafeta elaborates, "to identify the IP address of the P2P computer sending the file and to identify if parts of the file came from one or more IP addresses." Exhibit A at 6, ¶ 25. As Agent Iafeta had explained earlier in his affidavit, some files that can be obtained from a P2P network are compiled from several different source computers, which speeds the download time by allowing "download[ing] in parallel." Exhibit A at 6, ¶ 23.

Following this general description of the "use of computers with child pornography," is a section in which Agent Iafeta discusses the "specifics of searches and seizures of computer systems." Exhibit A at 6-8, ¶¶ 26-28. Agent Iafeta follows this discussion with another general section profiling "child pornography collector characteristics." Exhibit A at 8-10, ¶¶ 29-30. The final section of Agent Iafeta's affidavit, entitled "Factual Background of the Investigation," Exhibit A at 10-15, ¶¶ 10-15, sets out the specific facts, as opposed to the preceding opinions and general information, predicating probable cause to issue the warrant.

In this final section of his affidavit, Agent Iafeta notes that "[t]his application for a search warrant … grows out of a referral from Intel Research Specialist (IRS) Alexis Slebodnick of the ICE Cyber Crimes Center (C3)," who had "advised the ICE office in Honolulu of an operation called 'Operation Enea,'" which Norwegian and Danish law enforcement officers had conducted. Exhibit A at 10-11,

¶¶ 31-32. According to Agent Iafeta, Specialist Slebodnick told the Honolulu "ICE office" that "*during*" Operation Enea "a computer located at Bailey's residence was determined to be sharing child pornography files over the Internet through P2P software." Exhibit A at 10, ¶ 31 (emphasis added). Agent Iafeta generally asserted that, "[b]ased on discussions with ICE agents who investigate child pornography offenses, and a review of investigative reports, [he] believe[d] there is probable cause to believe that evidence of various child pornography offenses is presently located in a computer and related storage media at Bailey's residence." Exhibit A at 10, ¶ 31.

Operation Enea, Agent Iafeta elaborated, was an investigation "conducted by the Norwegian Police and the Danish National Police" into the "sharing of child pornography over 'FastTrack,' a worldwide file-sharing network." Exhibit A at 10-11, ¶32. In "anticipation" of conducing this investigation, Danish and Norwegian law enforcement officers, according to Agent Iafeta, "prepared a database of hash values of pictures and videos known to constitute child pornography." Exhibit A at 11, ¶ 34. The video and photograph files that they included in this database were obtained from "files seized in prior criminal cases" by Norwegian law enforcement officers, Interpol, and "other foreign authorities." Exhibit A at 11, ¶ 34. Agent Iafeta did not explain how the files on this database

were determined to consist of actual, as opposed to suspected or virtual, child pornography.

Agent Iafeta did explain, however, that FastTrack was a P2P network on which computers known as "supernodes" stored "information about each shared file" on the network. Exhibit A at 11, ¶ 32. This "information" included "file names and 'hash values,' or unique mathematical values equivalent to an electronic fingerprint." Exhibit A at 11, ¶ 32. Agent Iafeta asserted that, "[t]hrough the use of hash values, investigators are able to determine that certain files are identical." Exhibit A at 11, ¶ 32. He further described how a user could obtain a file on FastTrack. A user's search term would be sent to whichever supernode computer the user happened to be connected to and, in response, the supernode computer would send the user "an index of [other] users sharing the requested material." Exhibit A at 11, ¶ 33. The supernode would "also store user names ..., as well as IP addresses used to make connections to the network." Exhibit A at 11, ¶ 33. Once the user selected a file to download, the file would be downloaded directly from the "host computer" that actually stored the file -- or, if "downloaded in parallel," from the host computers storing various parts of the file -- rather than the supernode computer. Exhibit A at 11, ¶ 33; accord id. at 6, ¶ 23.

Agent Iafeta then related that one Norwegian investigator searched the FastTrack network using the term "[u]nderage" and "downloaded" some twenty-eight video files from a particular IP address, which "was traced" to a Hawaii-based ISP:

> On March 27, 2004, at approximately 18:10:02 Greenwich Mean Time (GMT) +0100, ENEA Investigator Kvinnegaard[1] of the Norway National Criminal Investigation Service conducted a search using the term "Underage.["] Investigator Kvinnegaard saw that a computer connected to the network via IP address 24.161.147.253 had multiple files responsive to his search. A screen capture was taken of the search and of the files available from IP address 24.161.147.253.
>
> Enea Investigator Kvinnegaard then downloaded twenty-eight (28) files from the IP address 24.161.147.253 bearing the following file names:
>
> ....
>
> IP address 24.161.147.253 was traced[2] through a search of Arin Whois, an online database containing records revealing who owns an IP address. The trace revealed that the IP address belonged to ROADRUNNER-HAWAII2 in the United States. Roadrunner, which is owned by Time Warner Cable, is an Internet Service Provider operating in Hawaii.

---

[1] Agent Iafeta misspells Investigator Kvinnegard's name.

[2] Agent Iafeta's earlier assertion that Danish and Norwegian investigators had "determined" that "a computer located at Bailey's residence" was involved in sharing child pornography "during" Operation Enea creates the impression that the 'tracing' this paragraph asserts occurred was done by Operation Enea investigators, not American agents.

Exhibit A, at 11-12, ¶¶ 35-37 (paragraph numbering and list of twenty-eight file names omitted).

According to Agent Iafeta, Investigator Kvinnegard conducted the forgoing search and investigation on March 27, 2004. Exhibit A at 11, ¶ 35. Agent Iafeta relates in his affidavit that, some three months later, on June 3, 2004, Specialist Slebodnick obtained "account information" from Time Warner Cable identifying Bailey as the "user of IP address 24.161.147.253 *at the time the files were downloaded.*" Exhibit A at 12, ¶ 38 (emphasis added). Nearly two months later, on August 30, 2004, an unnamed "Special Agent in Charge" of the ICE office in Honolulu "received a compact disk containing the 28 videos and the screen capture of the search and file titles."[3] Exhibit A at 12, ¶ 39. Agent Iafeta's affidavit suggests -- but does not actually state -- that the files on this disk were the files that, according to Agent Iafeta, Investigator Kvinnegard actually had downloaded from Bailey's computer using the FastTrack P2P network. Agent Iafeta claimed to have viewed each of the 28 videos and to have personally "determined them to be child pornography as defined in Title 18, United States Code, Section 2256, that is, visual

---

[3] Again, given its surrounding context, Agent Iafeta's affidavit creates the impression that this compact disk was sent by and received from the Norwegian and Danish investigators conducting Operation Enea.

10

depictions of minors engaged in sexually explicit conduct[.]"[4] Exhibit A at 12-13, ¶ 39. Agent Iafeta further asserts that he "also reviewed the list of files [that] the Enea Investigator determined were available from IP address 24.161.147.253 *at the time of the download*," the titles of eight of which were, he opined, "indicative of child pornography." Exhibit A at 13, ¶ 40 (emphasis added).

Agent Iafeta's affidavit then relates information confirming that Bailey had a service account with Roadrunner and confirming his residential address. Exhibit A at 13-14, ¶¶ 42-45. And he concludes his affidavit by relating the opinion of "GS Bratt," who asserted that Bailey "fits the profile of a collector of child pornography" because:

> a. Investigators *downloaded* 28 video files containing child pornography from Bailey's computer, and saw that his computer contained at least 8 additional files whose titles were indicative of child pornography;
>
> b. [t]he user of Bailey's computer employed peer to peer software enabling files to be uploaded and downloaded; and
>
> c. [p]ersons who use peer to peer software to share child pornography typically retain images to be traded with others.

---

[4] Agent Iafeta's qualifications for being able to distinguish actual child pornography from "virtual" or "morphed" child pornography are not set forth in his affidavit. See Ashcroft v. Free Speech Coalition, 535 U.S. 243 (2002). As such, his assertions claiming that the files he viewed were *actual* child pornography are, at best, personal, lay opinions, nothing more.

Exhibit A at 14, ¶ 46 (emphasis added).

Agent Iafeta's description of Operation Enea and, specifically, of Investigator Kvinnegard's investigation is false. Vernon Branco, an investigator for the Office of the Federal Public Defender for the District of Hawaii, contacted Investigator Kvinnegard. Investigator Kvinnegard responded via e-mail, attached to which he sent a one-page Enea User Report, a form summarizing the search he conducted on FastTrack and its results in this case. Exhibit C at 1, 3. In his letter, Investigator Kvinnegard states that he *did not download any files from Bailey's computer*:

> [The Enea User Report form] show[s] how many files that actually was downloaded from this user. *In this case we have not downloaded any files from the user.* As the operation past on, we experienced that it became a long delay between our decision to generate a case and to the download started. When we marked files for downloading, this was placed in a download queue. After some time we had generated so many cases that the download queue become big and long. The resulted was that in some of the cases the user had logged out before the download started, or the user logged out before the download was finished.
>
> I'm sorry that we have not managed to download any files in this case.

Exhibit C at 1 (emphasis added).

Nor, as Agent Iafeta claimed in his affidavit, did Investigator Kvinnegard search FastTrack using the term "[u]nderage." Rather, Investigator Kvinnegard "did a keyword search" that "[i]n this case ... was childlover." Exhibit C at 1. This search "gave us users," Investigator Kvinnegard explains in his letter, "that had files with this keyword, next we asked for the whole list of files they shared," the "hashvalue[s]" of which "we compared with our database." Exhibit C at 1. In this case, the user of IP address 24.161.147.253 shared 241 files on FastTrack, only 28 of which had hashvalues matching Operation Enea's master database of child pornography. Exhibit C at 1, 3.

Furthermore, Investigator Kvinnegard notes that Operation Enea's master child pornography database *is over inclusive*, insofar as some of the files it contains are not child pornography: "We have after the operation found some files in our database that not are child[-]pornographic, so we advice everyone to check the pictures that are forwarded, that these really are illegal." Exhibit C at 1. Agent Iafeta's affidavit, however, leaves one with the impression that all of the files contained in the Norwegian master database were determined to consist of nothing but actual child pornography.

In light of Investigator Kvinnegard's e-mail, it also seems that the only reasonable inference that can be drawn about the twenty-eight files on the compact

disk that Agent Iafeta asserted the ICE office had received, which his affidavit falsely claims Investigator Kvinnegard actually downloaded from Bailey's computer, were in fact nothing but copies of files on the Norwegian master database. Exhibit D, which consists of an affidavit prepared by Federal Bureau of Investigation Special Agent Jay D. Johnson in another case generated by Operation Enea, more accurately describes the Danish and Norwegian investigation and confirms that such is, in fact, true. Agent Johnson's affidavit also reflects other misstatements in and omissions from Agent Iafeta's affidavit. See Exhibit D at 12-15, ¶¶17-26.

Agent Johnson's affidavit explains that the Norwegian master database "contain[ed] images of *suspected* child pornography *and other non-pornographic images* from known child pornography series[.]" Exhibit D at 13, ¶ 18 (emphases added). Agent Iafeta, then, falsely described the Norwegian master database as containing "hash values of pictures and videos *known to constitute child pornography*" and misleadingly omitted entirely the part about it also containing non-pornographic material. Exhibit C at 11, ¶ 34 (emphasis added). Agent Johnson's affidavit also describes, with greater detail, sophistication, and clarity than Agent Iafeta managed to muster, the actual two-day investigation that Norwegian and Danish police undertook. Exhibit D at 13-15, ¶¶ 20-26. Notably, Agent Johnson does not assert that the Norwegian and Danish investigators actually downloaded *any*

14

images from FastTrack users. See ibid. Rather, they "ran a computer program that compared" hash values of FastTrack shared files with those contained in the Norwegian master database. Exhibit D at 14, ¶ 23. For any match, the Operation Enea investigators complied a "digital file" consisting of:

> FastTrack Usernname; IP address and online date and time; the user's ISP; the keyword(s) that had initially identified the user; the time the investigators retrieved the infromation about the user; the number of shared files on the user's computer; the number of shared files that matched the Fast Track Hash Values in the Norwegian Database; the corresponding hash values; the size of the matching file on the user's computer; and the size of the matching file as it exists in the database of known child pornography images. …. Also placed in that file were copies of the child pornography images represented by the hash values that had been matched during the investigation.

Exhibit D at 14-15, ¶ 24.

Also omitted from Agent Iafeta's affidavit, but described in Agent Johnson's affidavit, is how this information came to be shared with American law enforcement authorities:

> [D]uring the fifty hour period of undercover investigation the Norwegian and Danish Police identified approximately 1300 targets located in the United States whose shared files on the FastTrack network matched seven or more [hash values] of images contained in the Norwegian Database.
>
> On April 30, 2004, at a meeting of Interpol, the Norwegian and Danish Police presented information about

15

>   the investigation to representatives from several countries. At that time, representatives of the FBI, ICE and the United States Department of Justice were presented with a computer hard drive containing the data from the investigation, including the digital files containing detailed information about the targeted computer users.

Exhibit D at 15, ¶¶ 25 and 26 (paragraph numbering omitted).

As the principal agent investigating Bailey, Agent Iafeta knew or should have known not only how to spell Investigator Kvinnegard's name, but the search term he used resulting in 'hits' to files stored at IP address 24.161.147.253, and, most importantly, that Investigator Kvinnegard's investigation did *not* include downloading *any* images from that IP address. Cf. Gonzalez, Inc., 412 F.3d at 1111 ("[g]iven the affiant's key role in the investigation, we can conclude that he knew or should have known the veracity of the challenged statements in his affidavit"). Moreover, the requisite reckless, if not intentional, disregard of the veracity of his statements about Investigator Kvinnegard's investigation can also be inferred from the fact that Agent Iafeta's misrepresentations and omissions included outright fabrications about what Operation Enea entailed -- such as his assertion that Investigator Kvinnegard actually downloaded files directly through a peer to peer connection with Bailey's computer and his insinuation that the disk that the Honolulu ICE office received contained the files downloaded from Bailey's computer.

If Agent Iafeta's misrepresentations about Investigator Kvinnegard's investigation are omitted, the remaining information set forth in Agent Iafeta's affidavit does not establish probable cause to search Bailey's residence and computers. Paragraphs 34, 35, and 36 of Agent Iafeta's affidavit are subject to redaction, because: (1) the Norwegian master database contained only suspected child pornography as well as files that did not contain child pornography at all, not, as Agent Iafeta asserted, just known child pornography; (2) Investigator Kvinnegard did not isolate the IP address 24.161.147.253 using "underage" as the search term; and (3) Investigator Kvinnegard did not download any files from that IP address. Other references to files that were downloaded by Investigator Kvinnegard must also be stricken from paragraphs 38, 39, 40, and 46. Paragraph 39 should be redacted in its entirety as well, given that the "28 videos" Agent Iafeta claims to have personally watched and which he claims depict child pornography came from the Norwegian master database, not Bailey's computer. Furthermore, "GS Bratt's" opinions, set forth in paragraphs 46 and 47, should also be omitted, since they are based on Agent Iafeta's misrepresentation that "[i]nvestigators downloaded 28 video files containing child pornography from Bailey's computer." Exhibit C at 14, ¶ 46. Each and every one of these assertions is false. For this Court's convenience, appended as Exhibit E is a copy of the "Factual Background of the Investigation" section of Agent Iafeta's

affidavit with the information that Bailey contends is false or derived from false information -- and which he, therefore, submits should be redacted from the affidavit -- highlighted in yellow.

Correlatively, appended as Exhibit F is a second copy of the same portion of the affidavit that has this information actually redacted, which clearly reflects the absence of probable cause to issue the warrant. What remains in the affidavit's "Factual Background of the Investigation" section, apart from Agent Iafeta's generalized descriptions of P2P file sharing, is the following information. Norwegian and Danish investigators conducted an investigation called Operation Enea. The IP address 24.161.147253 was traced to Bailey's computer. Even if paragraph 40 of Agent Iafeta's affidavit is not omitted in its entirety (which Bailey submits it should be, given that Agent Iafeta misrepresents the network search that Investigator Kvinnegard conducted and the information set forth in paragraph 40 is claimed to have derived from Investigator Kvinnegard's search), it merely opines that certain file titles IP address 24.161.147.253 had "available" for sharing on FastTrack are "indicative of child pornography." Such an opinion, standing alone, is insufficient to establish probable cause. Cf. United States v. Arvizu, 534 U.S. 266, 273-274 (2002) ("hunches" fail to establish even reasonable suspicion); Richards v. Wisconsin, 520 U.S. 385, 392-394 (1997) (rejecting *per se* exception to knock-and-

announce rule based on generalized stereotypes); accord United States v. Combs, 394 F.3d 739, 745 n. 5 (9th Cir. 2005) ("[w]e take care to note that '[t]he officers' concerns were not based on generalizations or stereotypes[,] ... but rather on particularized, articulable and reliable informatio n'" (quoting United States v. Bynum, 362 F.3d 574, 580-581 (9th Cir. 2004))). The only other information particularized to Bailey in the affidavit is wholly innocuous, having to do with the fact that he has a residential internet service account and the fact that Agent Iafeta confirmed he lived at a certain address.

## CONCLUSION

In sum, the attached exhibits not only satisfy Bailey's preliminary obligation under Franks and, thus, not only entitle him to evidentiary hearing on this motion. They also establish both substantive prongs of the Franks inquiry and, thus, necessitate suppression of any and all evidence that the government obtained as a result of executing the warrant that issued on the basis of Agent Iafeta's false and misleading affidavit.

DATED:  Honolulu, Hawaii, April 3, 2006.

／s/ Donna M. Gray
DONNA M. GRAY
Attorney for Defendant
ANDREW BAILEY