SEALED
BY ORDER OF THE COURT

AO 106 (Rev. 7/87) Affidavit for Search Warrant

FILED IN THE
UNITED STATES DISTRICT COUR
DISTRICT OF HAWAII

SEP 10 2004
at 1 o'clock and 28 min. P
WALTER A.Y.H. CHINN, CLER

# United States District Court

DISTRICT OF HAWAII

In the Matter of the Search of
(Name, address or brief description of person, property or premises to be searched)

94-1213 Oli Loop
Waipahu, Hawaii 96797

## APPLICATION AND AFFIDAVIT FOR SEARCH WARRANT

CASE NUMBER: Mag. No. 04-614 LEK

I SIAVE P. IAFETA being duly sworn depose and say:

I am a(n) Special Agent with the United States Immigration and Customs Enforcement (Official Title) and have reason to believe

that ☐ on the person of or ☒ on the property or premises known as (name, description and/or location)
See Attachment "A" attached to the affidavit attached hereto, and which is incorporated by reference.

in the ______ District of Hawaii
there is now concealed a certain person or property, namely (describe the person or property to be seized)
See Attachment "B" attached to the affidavit attached hereto, and which is incorporated by reference.

which is (state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)
See affidavit attached hereto, and which is incorporated by reference.

concerning a violation of Title 18 United States code, Section(s) 2252 and 2252A.
The facts to support a finding of Probable Cause are as follows:
See affidavit attached hereto, and which is incorporated by reference.

Continued on the attached sheet and made a part hereof. ☒ Yes ☐ No

[signature]
Signature of Affiant

Sworn to before me, and subscribed in my presence

09-10-2004 at Honolulu, Hawaii
Date City and State

Leslie E. Kobayashi, United States Magistrate Judge
Name and Title of Judicial Officer

[signature] SEAL
Signature of Judicial Officer

AGENT'S AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

SIAVE P. IAFETA, being first duly sworn, deposes and states as follows:

INTRODUCTION AND PREMISES TO BE SEARCHED

1. I am a Special Agent with the Department of Homeland Security, United States Immigration and Customs Enforcement (ICE) Office of Investigation, Honolulu, Hawaii, and have been so employed since October 2003. Prior to that I was an Immigration Inspector from April 2002 to October 2003. During the course of my duties as an inspector and a special agent, I have personally conducted and participated in investigations of criminal violations which are set forth in the Immigration and Nationality Act (INA). In August 2004, I successfully completed the ICE Academy Course in Glynco, Georgia. At the ICE Academy I received training in the investigation of various criminal offenses, including offenses involving child pornography and the sexual exploitation of children.

2. Title 18, United States Code, Section 2252 (a)(1) prohibits a person from knowingly transporting or shipping in interstate or foreign commerce, by computer or mail, any visual depiction of minors engaged in sexually explicit conduct. Under Title 18, United States Code, Section 2252(a)(2), it is a crime for any person to knowingly receive or distribute, by computer or mail, any visual depiction of minors engaged in sexually explicit conduct that has been mailed or shipped or transported in interstate or foreign commerce. That section also makes it a federal crime for any person to knowingly reproduce any visual depiction of minors engaging in sexually explicit conduct for distribution interstate or foreign commerce by any means, including by computer or the mail. Under Title 18, United States Code, Section 2252(a)(4), it is also a crime for a person to possess one or more books, magazines, periodicals, films, or other materials which contain visual depictions of minors engaged in sexually explicit conduct that have been transported in interstate or foreign commerce.

3. I am investigating the activities of Andrew Bailey of Waipahu, Hawaii. As will be shown below, there is probable cause to believe that Bailey has distributed, and currently possesses, child pornography, in violation of Title 18, United States Code, Sections 2252 and 2252A. I am submitting this affidavit in support of a search warrant authorizing a search of Bailey's residence, which is located at 94-1213 Oli Loop; Waipahu, Hawaii 96797(hereinafter the "subject premises"), and is more particularly described in Attachment "A" hereto, for the items specified in Attachment "B" hereto, which items constitute instrumentalities, fruits, and evidence of the foregoing violations. I am requesting authority to search the entire subject premises, including the residential dwelling and any

computer and computer media located therein where the items specified in Attachment "B" may be found.

4. The statements contained in this affidavit are based on my own investigative efforts or, where indicated, information provided by others. Since this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence of violations of Title 18, United States Code, Sections 2252 and 2252A, are located at the above premises.

**DEFINITIONS**

5. "Child Erotica" are materials or items that are sexually arousing to pedophiles but that are not in and of themselves obscene or which not necessary depict minors in sexually explicit poses or positions. Child erotica is defined as follows:

> Any material, relating to children, that is sexually arousing to a given individual... Some of the more common types of child erotica include photographs that are not sexually explicit, drawings, sketches, fantasy writings, diaries, and sexual aids.

6. "Child Pornography," as used in this affidavit, shall have the definition set forth in 18 U.S.C. section 2256(8), and shall include any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct. See 18 U.S.C. sections 2252 and 2256 (2).

7. The term "computer," as used herein, is defined pursuant to Title 18, United States Code, Section 1030 (e)(1), as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device."

8. "IP address" refers to a unique number used by a computer to access the Internet. IP addresses can be dynamic, meaning that the Internet Service Provider (ISP) assigns a

different unique number to a computer every time it accesses the Internet. IP addresses might also be static, if an ISP assigns a computer a particular IP address, which is used each time the computer accesses the Internet.

9. The terms "records," "documents," and "materials" include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, painting), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies), mechanical form (including, but not limited to, phonograph records, printing, typing) or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devises such as floppy diskettes, hard disks, CD-ROMS, digital video disks (DVDs), Personal Digital Assistants (PDAs), Multi Media Cards (MMCs), memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, Bernoulli drives, or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device).

10. "Sexually explicit conduct" means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any person(s). See Title 18, United States Code, Section 2256.

11. "URL" or "Uniform Resource Locator" refers to an Internet address. Each file on the Internet has a unique address called a Uniform Resource Locator, more commonly known as URL.

12. "Visual depictions" include undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image. See Title 18, United States Code, Section 2256(5).

USE OF COMPUTERS WITH CHILD PORNOGRAPHY

13. Computers and computer technology have revolutionized the way in which individuals interested in child pornography interact with each other. Child pornography formerly was produced using cameras and film (either still photography or movies). The photographs required darkroom facilities and a significant amount of skill in order to develop and reproduce the images. There were definable costs involved with the production of pornographic images. To distribute these on any scale required significant resources. The distribution usually

Bailey discovery 000000004

required a combination of personal contacts, mailing and telephone calls.

14. The development of computers has changed this. Computers basically serve four functions in connection with child pornography: production, communication, distribution, and storage.

15. Child pornographers can now transfer photographs from a camera onto a computer-readable format with a device known as a scanner. With the advent of digital cameras, the images can now be transferred directly onto a computer. A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection. Electronic contact can be made to literally millions of computers around the world.

16. The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. The size of the electronic storage media (commonly referred to as the hard drive) used in home computers has grown tremendously within the last several years. These drives can store thousands of images at very high resolution.

17. The Internet and its World Wide Web afford collectors of child pornography several different venues for obtaining, viewing and trading child pornography in a relatively secure and anonymous fashion.

18. Collectors and distributors of child pornography also use online resources to retrieve and store child pornography, including services offered by Internet Portals such as Yahoo! and Hotmail, among others. The online services allow a user to set up an account with a remote computing service that provides e-mail services as well as electronic storage of computer files in any variety of formats. A user can set up an online storage account from any computer with access to the Internet. Evidence of such online storage of child pornography is often found on the user's computer. Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer in most cases.

19. As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes. Storing this information can be intentional, i.e., by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files. Digital information can also be retained unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or ISP client software, among

others). In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. A forensic examiner often can recover evidence suggesting whether a computer contains peer-to-peer software, when the computer was sharing files, and some of the files, which were uploaded or downloaded. Such information is often maintained indefinitely until overwritten by other data.

20. Computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensic tools. When a person "deletes" a file on a home computer, the data contained in the file does not disappear, but instead remains on the hard drive until overwritten by new data.

21. A growing phenomenon on the Internet is peer to peer file sharing (P2P). P2P file sharing is a method of communication available to Internet users through the use of special software. Computers linked together through the Internet using this software form a network that allows for the sharing of digital files between users on the network. A user first obtains the P2P software, which can be downloaded from the internet. In general, P2P software allows the user to set up file(s) on a computer to be shared with others running compatible P2P software. A user obtains files by opening the P2P software on the user's computer, and conducting a search for files that are currently being shared on the network. Some types of P2P software allow searches to be done by keyword. The results of the keyword search are displayed to the user. The user then selects file(s) from the results for download. The download of a file is achieved through a direct connection between the computer requesting the file and the computer containing the file.

22. For example, a person interested in obtaining child pornographic images would open the P2P application on his/her computer and conduct a search for files using a term such as "preteen sex." The search is sent out over the network of computers using compatible P2P software. The results of the search are returned to the user's computer and displayed. The user selects from the results displayed the file(s) he/she wants to download. The file is downloaded directly from the computer hosting the file. The downloaded file is stored in the area previously designated by the user. The downloaded file will remain there until moved or deleted.

23. One of the advantages of P2P file sharing is that multiple files may be downloaded in parallel. This means that the user can download more than one file at a time. In addition, a user may download parts of one file from more than one source computer at a time. For example, when downloading an image, a user of the Limewire P2P software may receive parts of the image from multiple computers. The advantage of this is that it speeds up the time it takes to download the file. Often, however, a user of P2P software downloading an image file receives the entire image from one computer.

24. A P2P file transfer is assisted by reference to an Internet Protocol (IP) address. This address, expressed as four numbers separated by decimal points, is unique to a particular computer during an online session. The IP address provides a unique location making it possible for data to be transferred between computers.

25. Software is available to identify the IP address of the P2P computer sending the file and to identify if parts of the file came from one or more IP addresses. Such software monitors and logs Internet and local network traffic.

## SPECIFICS OF SEARCHES AND SEIZURES OF COMPUTER SYSTEMS

26. I have consulted with an expert in computer searches, Group Supervisory Special Agent (GS) Richard F. Bratt of ICE. According to GS Bratt, searching and seizing information from computers often requires agents to seize all electronic storage devices (along with related peripherals) to be searched later by a qualified computer expert in a laboratory or other controlled environments. This is true because of the following:

a. Computer storage devices (like hard disks, diskettes, tapes, laser disks, CD-ROMs, DVDs, and Bernoulli drives) can store the equivalent of hundreds of thousands of pages of information. Additionally, a suspect may try to conceal criminal evidence, and he might store criminal evidence in random order or with deceptive file names or deceptive file extensions. This requires searching authorities to examine all the stored data to determine which particular files are evidence or instrumentalities of crime. This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this kind of data search on site.

b. Searching computer systems for criminal evidence is a highly technical process, requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which is expert is qualified to

analyze the system and its data. In any event, data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even "hidden," erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to inadvertent or intentional modification or destruction (both from external sources and from destructive codes imbedded in the system, such as "booby traps"), a controlled environment is essential to its complete and accurate analysis.

27. Based upon my consultation with experts in computer searches, data retrieval from computers and related media, and consultations with other agents who have been involved in the search of computers and retrieval of data from computer systems, I know that searching computerized information for evidence or instrumentalities of crime commonly requires agents to seize all of a computer system's input/output peripheral devices, related software, documentation, and data security devices (including passwords) so that a qualified computer expert can accurately retrieve the system's data in a laboratory or other controlled environment. This is true because of the following:

a. The peripheral devices, which allow users to enter or retrieve data from the storage devices, vary widely in their compatibility with other hardware and software. Many system storage devices require particular input/output (or "I/O" devices in order to read the data on the system. It is important for the analyst to be able to properly re-configure the system as it now operates in order to accurately retrieve the evidence contained therein. In addition, the analyst needs the relevant system software (operating systems, interfaces, and hardware drivers) and any applications software, which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instruction manuals or other documentation and data security devices. If the analyst determines that the I/O devices, software, documentation, and data security devices are not necessary to retrieve and preserve the data after inspection, the government will return them within a reasonable time.

b. In order to fully retrieve data from a computer system, the analyst also needs all magnetic storage devices as well as the central processing unit (CPU). Further, the analyst again needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software that may have been used to create the data (whether stored on hard drives or on external media) for proper data retrieval.

Bailey discovery 000000008

28. In addition, there is probable cause to believe that the computer and its storage devices, the monitor, keyboard, and modem are all instrumentalities of the crimes of receipt, distribution and possession of child pornography, in violation of law, and should all be seized.

**CHILD PORNOGRAPHY COLLECTOR CHARACTERISTICS**

29. I have discussed this investigation in detail with several law enforcement officials, including GS Bratt who, among others, are responsible for child pornography investigations in the State of Hawaii. GS Bratt has received extensive training from ICE, the United States Customs Service (USCS) and other law enforcement agencies and officials in the area of child pornography and pedophile behavior. Additionally, as the former Child Pornography Investigations coordinator for the USCS, GS Bratt actively pursued and managed hundreds of child pornography investigations. GS Bratt has acquired more than eighty hours of specialized training in the area of child pornography and child sexual abuse through the USCS and the United States Department of Justice. This training focused on methods of investigating child sexual exploitation, child pornography, and obscenity offenses. GS Bratt has worked in the area of child pornography investigations for over 14 years, prior to the use of the Internet by the general public and prior to the advent of "morphing" technology. In addition to case specific training in the area of child exploitation, GS Bratt has received over 240 hours of training in the recovery of computer evidence.

30. Based on his knowledge, training, and experience, GS Bratt has advised me of the following traits and characteristics that are generally found to exist and be true in cases involving individuals who collect child pornography:

a. The majority of individuals who collect child pornography are persons who have a sexual attraction to children. They receive sexual gratification and satisfaction from sexual fantasies fueled by depictions of children that are sexual in nature.

b. The majority of individuals who are sexually attracted to children collect sexually explicit materials involving children, such as photographs, magazines, video tapes, books, slides and other computer images for their own sexual gratification. The most common method of acquiring the material is by trading the materials with other people with similar interests.

c. Since sex with children and the collection of child pornography is illegal, pedophiles desire privacy, anonymity, and a means to avoid detection by law enforcement.

The use of computers by pedophiles to traffic, trade, and collect child pornography and obscenity is a growing phenomenon. An individual familiar with computers can utilize the computer's ability to interact with many distant individuals while remaining largely hidden. This sense of privacy and secrecy along with the ability to interact with many individuals without risk of easy identification satisfies the needs of individuals who are interested in trafficking, trading, and collecting child pornography.

d. Individuals involved in the collection of child pornography **RARELY, IF EVER**, dispose of their sexually explicit material. Such materials are instead treated as prized possessions, which can be viewed or traded over a long period of time. It is further unlikely that the condition of those items depicting the sexual exploitation of children will be altered or damaged from the original condition at the time of receipt based on the desire to keep the items in the original condition. Moreover, taken together, the increased sense of security which a computer affords and the known desire to retain child pornography and other prohibited obscenities for long periods provide probable cause to believe that computer images will be retained for as long as other types of child pornography. During the execution of numerous search warrants, law enforcement officers have found that pedophiles who store child pornography on their computers typically retain the images indefinitely.

e. Individuals involved in the sexual exploitation of children often collect books, magazines, newspapers, letters, and other materials relating to children. Such individuals also collect other written material on the subject of sexual activities with children, which range from fantasy to medical, sociological, psychological, and psychiatric writings. Such contact, correspondence, or writings can and are now done by computer as well as through the use of mails or telephone. They rarely destroy these materials because of the psychological support and reinforcement they provide; the materials tend to validate each pedophile's interest by making that person feel his/her interests are normal rather than deviant.

f. Individuals involved in the collection and distribution of child pornography almost always maintain and possess their materials in a place considered secure, most frequently within the privacy and security of their own homes. As discussed above, child pornography, obscenity, or related materials may also be stored in a computer that may be additionally protected by passwords and other security devices.

g. Individuals who are procurers and distributors of child pornography contrary to law, exhibit

similar characteristics and will maintain their pictures, films, correspondence, and photographs in a secure place, most often a residence, to avoid detection by law enforcement. I also know that child pornography is not lawfully available in retail establishments and that person(s) who wish to obtain child pornography do so by ordering it abroad or by discreet contact with other individuals who have it available.

h. Individuals who are involved with child pornography will often collect, read, copy, or maintain numbers or lists of persons who have similar sexual interests. These contacts are maintained as a means of personal referral, exchange, and commercial profit. These names may be maintained in the original publication or mode of receipt, in phone books, notebooks, scraps of paper, or in computers.

i. Individuals who receive, transport, possess, and distribute child pornography, contrary to law, often keep records of their involvement with such activities, and these records include but are not limited to associate names and addresses, the identity and location of assets illegally gained through criminal activity, child erotica and material used to create, receive, transport, possess, distribute, and sell child pornography.

**FACTUAL BACKGROUND OF THE INVESTIGATION**

31. This application for a search warrant authorizing a search of Andrew Bailey's residence grows out of a referral from Intel Research Specialist (IRS) Alexis Slebodnick of the ICE Cyber Crimes Center (C3). As will be described below, IRS Slebodnick advised the ICE office in Honolulu of an operation called "Operation Enea," during which a computer located at Bailey's residence was determined to be sharing child pornography files over the Internet through P2P software. Based on discussions with ICE agents who investigate child pornography offenses, and a review of investigative reports, I believe there is probable cause to believe that evidence of various child pornography offenses is presently located in a computer and related storage media at Bailey's residence. The investigation may be summarized as follows.

32. IRS Slebodnick has advised that the ICE Cyber Crimes Center (C3) and the Federal Bureau of Investigation (FBI) have identified persons in the United States suspected of trafficking child pornography over the Internet through an international investigation called "Operation Enea." Operation Enea was a peer-to-peer investigation conducted by the Norwegian Police and the Danish National Police. According to the investigative reports, the operation was aimed at identifying persons who were sharing child pornography over "FastTrack," a

worldwide file-sharing network. As with other P2P networks, the FastTrack networks enables users to install software and then exchange files containing pictures, videos and music globally. Each user has the ability to determine which files on his hard disk are made available to others over the network. When a user connects to the network, the information about each shared file is stored on central servers called "supernodes." The supernodes in turn consist of computers that meet specific requirements concerning bandwidth, and contain lists of files, which each connected user made accessible over the network. The information includes file names and "hash values," or unique mathematical values equivalent to an electronic fingerprint. Through the use of hash values, investigators are able to determine that certain files are identical.

33. When a user searches for files on the FastTrack network, the request is sent to the supernode to which the user is connected. The user then receives an index of users sharing the requested material. The supernodes also store user names selected by the particular users, as well as IP addresses used to make connections to the network. Once a user selects a file for downloading, the downloading does not occur through the supernode. A user instead establishes a direct peer-to-peer connection with the host computer, and downloads the file directly.

34. In anticipation of the operation, the Danish and Norwegian law enforcement authorities prepared a database of hash values of pictures and videos known to constitute child pornography. The authorities reviewed files seized in prior criminal cases in Norway, as well as files contained in databases maintained by Interpol and other foreign authorities. An undercover officer then searched the FastTrack network by using keywords frequently used in connection with child pornography.

35. On March 27, 2004, at approximately 18:10:02 Greenwich Mean Time (GMT)+0100, ENEA Investigator Kvinnegaard of the Norway National Criminal Investigation Service conducted a search using the term "Underage. Investigator Kvinnegaard saw that a computer connected to the network via IP address 24.161.147.253 had multiple files responsive to his search. A screen capture was taken of the search and of the files available from IP address 24.161.147.253.

36. Enea Investigator Kvinnegaard then downloaded twenty-eight (28) files from the IP address 24.161.147.253 bearing the following file names:

a. Pedo 8yr Brazilian girl.mpg
b. Pedo Doctor.avi
c. PEDO-1.mpg

    d. pedo long vid.mpg
e. Childlover_little_Collection_Video_0080.mpg
f. Pedo babyj ass fuck.mpg
g. Pedo.mpg
h. dorm Pédo.mpg
i. 0039.mpg
j. babyj-Dog cums in 10yo.mpg
k. Babyj-14.mpg
l. TOTAL ILEGAL PEDO.mpg
m. VJ1.mpg
n. Raygold Thai Hooker.mpg
o. raygold long video.avi
p. RAPE-cop in Dacula Georgia rapes a 12 yr old.mpeg
q. PEDO-1.mpg
r. Pedo-childlover_anya complete_12m32s.mpg
s. Lolitas-Mamadas_04.mpg
t. kiddy--Vanessa (12yrs) (36.6MB)(3).mpg
u. Kiddy wow.mpg
v. Childlover_little_Collection_Video_0099.avi
w. bd sm bdsm_torture slave bondage (1.59mins-low quality).mpg
x. BabyJ-Long.mpg
y. (Pedo) Cas-3-5.mpg
z. boy.kiddy.pedo.01.mpeg.mpeg
aa. babyj ass fuck.mpg
bb. Babyj-babycum.mpeg

37. IP address 24.161.147.253 was traced through a search of Arin Whois, an online database containing records revealing who owns an IP address. The trace revealed that the IP address belonged to ROADRUNNER-HAWAII2 in the United States. Roadrunner, which is owned by Time Warner Cable, is an Internet Service Provider operating in Hawaii.

38. On June 3, 2004, ICE Analyst Alexis Slebodnick served an administrative subpoena to Time Warner Cable, requesting the identification of, and account information pertaining to, the user of IP address 24.161.147.253 at the time the files were downloaded. On July 30, 2004, Time Warner Cable responded via facsimile, that the subscriber using the IP address 24.161.147.253 on March 27, 2004, at 18:10:02 GMT+0100 was Andrew Bailey, at 94-1213 Oli-Loop, Waipahu, Hawaii 96734, with telephone number (808) 678-0031, and username of baileya001.chelle.

39. On or about August 30, 2004, ICE, Office of the Special Agent in Charge (SAC) Honolulu received a compact disk containing the 28 videos and the screen capture of the search and file titles. I have reviewed the 28 videos and determined them to be child pornography as defined in Title 18, United States Code,

Section 2256, that is, visual depictions of minors engaged in sexually explicit conduct, including intercourse, masturbation, and the lascivious exhibition of the genitals or pubic area, or depictions indistinguishable from minors engaged in such conduct.

40. I have also reviewed the list of files, which the Enea Investigator determined were available from IP address 24.161.147.253 at the time of the download. The computer using that address appeared to be sharing 241 files relating to music and pornography. In addition to the 28 files which were downloaded, the computer was sharing the following:

a. Little_oral_annie_b.mpg
b. Japanese girl hard sex DVD.HQ mpg 13yo rape and crying
c. 0039.mpg, TVG013 12yrs youngporn, kiddy, bondage
d. zadoom pedo man fuck boy 8yr.WMV
e. assedteen5.mpg
f. BabyJ-Teddy.mpg
g. BabyJ-Mine.mpg
h. BabyJ Mine-avi

41. Based on prior investigations of other ICE Agents and my training, I believe these file titles are indicative of child pornography. For example, I know that "young porn" and "pedo" are phrases frequently used to denote child pornography.

42. On August 30, 2004, an administrative subpoena was issued to Time Warner Cable, requesting subscriber account information pertaining to Andrew Bailey. On September 1, 2004, Time Warner indicated that Andrew Bailey began receiving Roadrunner Residential service on December 23, 1998, and that the service was still active. Time Warner indicated that Roadrunner service is being provided to Andrew Bailey at 94-1213 Oli Loop, Waipahu, Hawaii 96797, and that Andrew Bailey maintains a telephone number of (808) 678-0031.

43. I know from prior investigations by other ICE Agents and my personal experience that Time Warner Cable offers Oceanic Road Runner Internet service to residential customers. The Oceanic Road Runner service provides Internet access to residential customers through cable connection (rather than dial-up), with the computer used for the Internet access connected through a cable modem to a cable line that is run directly to the subscriber's residence. Based on this information, I believe there is probable cause to believe that a computer, modem, and associated equipment are presently located at 94-1213 Oli Loop, Waipahu, Hawaii 96797.

44. I have searched various record indices for information on Andrew Bailey. ChoicePoint database indicates that Andrew Bailey also known as Bailey, Andrew H, had a residential address of 94-1213 Oli Loop, Waipahu, Hawaii 96797, as of February 2004. According to the United States Postal Service, mail was being delivered to Andrew Bailey at 94-1213 Oli Loop, Waipahu, Hawaii 96797, as of September 2, 2004. State of Hawaii records reflect that Andrew Bailey, social security number 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, date of birth February 21,1976, has a driver's license which expires on February 2, 2005, with a mailing address of 94-1213 Oli Loop, Waipahu, Hawaii 96797.

45. On September 3, 2004, I drove past 94-1213 Oli Loop, Waipahu, Hawaii 96797. The residence at that address is described in Attachment "A" hereto. I observed a Blue Dodge four-Door Sedan parked in the roadside of the residence (Hawaii License NBG729). The Sedan is registered to Andrew Bailey at 94-1213 Oli Loop, Waipahu, Hawaii 96797.

46. Based on his review of the investigative materials, GS Bratt has advised me that, in his opinion, Andrew Bailey (or a person in his household) fits the profile of a collector of child pornography, as described in this affidavit. GS Bratt bases this opinion on the following:

a. Investigators downloaded 28 video files containing child pornography from Bailey's computer, and saw that his computer contained at least 8 additional files whose titles were indicative of child pornography;

b. The user of Bailey's computer employed peer to peer software enabling files to be uploaded and downloaded; and

c. Persons who use peer to peer software to share child pornography typically retain images to be traded with others.

47. GS Bratt further believes that, for the reasons stated elsewhere in this affidavit, evidence of the distribution, receipt and possession of child pornography will be found on Bailey's computer and/or storage media. In his opinion, Bailey's use of FastTrack to share files suggests that his file collection will be fluid and change depending on which files have recently been downloaded or uploaded. Based on my experience and GS Bratt's experience, persons who use P2P networks frequently download materials and then sort them into directories where they are stored more permanently. GS Bratt also believes that, given the number of child pornographic files previously seen on Bailey's computer, such files (or remnants of them) are probably still on his computer.

WHEREFORE, based upon the foregoing, I believe that there is probable cause to believe that at the residence of Andrew Bailey, described in Attachment "A" hereto, there are presently located the specific items in Attachment "B" hereto, which items constitute evidence of the commission of criminal offenses, namely, violations of Title 18 United States Code, Sections 2252 and 2252A, contraband, the fruits of crimes, or other things otherwise criminally possessed, or property which is or has been used as the means of committing the foregoing offenses.

FURTHER AFFIANT SAYETH NAUGHT.

Siave Iafeta
Special Agent
Immigration and Customs Enforcement

Subscribed and sworn to
before me on September 10, 2004

LESLIE E. KOBAYASHI
United States Magistrate Judge

SEAL

**ATTACHMENT "A"**

**PREMISES TO BE SEARCHED**

The residence of Andrew Bailey, located at 94-1213 Oli Loop, Waipahu, Hawaii 96797. The residence is a two-story single family home. The residence is the last house on the right corner of Ukee Street and Oli Loop, facing Ewa side. The house is light brown with dark brown trim and brown shingle type roofing. There is a white-grey mailbox bearing the numbers "94-1213" affixed in black and Silver.

ATTACHMENT "B"

LIST OF ITEMS TO BE SEIZED

1. Any computers, including desktop computers and laptop computers, and storage devices such as hard drives, zip disks, CDs, and floppy disks, that were or may have been used as a means to provide images of child pornography over the Internet in violation of Title 18, United States Code, Sections 2252 and 2252A.

2. All materials, in whatever form, media, or format, including computer files, prints, videos, videotapes, photographs, negatives, magazines, and books, which contain child pornography, child erotica, or the visual depictions of minors engaged in sexually explicit conduct, or computer generated images that are indistinguishable from visual depictions of minors engaged in sexually explicit conduct, as defined in Title 18, United States Code, Sections 2252, 2252A and 2256.

3. Any electronic data processing and storage devices, computers and computer systems, all tapes, cassettes, cartridges, streaming tape, commercial software and hardware, computer disks, disk drives, monitors, computer printers, modems, tape drives, disk application programs, data disks, system disk operating systems, magnetic media floppy disks, tape systems and hard drive, terminals (keyboards and display screens) and other computer related operation equipment, computer photographs, and digital graphic file format equipment that may contain, or be used to contain, any child pornography, visual depictions of minors engaged in sexually explicit conduct, or child erotica, or information pertaining to sexual interest in child pornography or child erotica, to sexual activity with children, or to the distribution, possession, or receipt of child pornography or child erotica.

4. Any and all computer software, including programs to run operating systems, applications (like word processing, graphics, or spreadsheet programs), utilities, compilers, interpreters, and communications program.

5. Any computer-related documentation, which consists of written, recorded, printed or electronically stored material that explains or illustrates how to configure or use computer hardware, software, or other related items.

6. Any and all records and materials, in whatever form, media, or format (including, but not limited to, envelopes, letters, papers, e-mail, chat logs and electronic messages, other digital data files and web cache information) (a) pertaining to the possession, receipt, or distribution of child pornography or the visual depictions of minors engaged in sexually explicit conduct; (b) identifying persons transmitting through interstate or foreign commerce, including via computer, any child

pornography or visual depiction of minors engaged in sexually explicit conduct; or (c) bearing on the receipt, shipment, or possession of child pornography or the visual depictions of minors engaged in sexually explicit conduct.

7. Records of communication (as might be found, for example, in digital data files) between individuals concerning the topic of child pornography, the existence of sites on the Internet that contain child pornography or which cater to those with an interest in child pornography, as well as evidence of membership in online clubs, groups, services, or other Internet sites that provide or make accessible child pornography to its members and constituents.

8. Evidence of association, by use, subscription or free membership, with online clubs, groups, services, or other Internet sites that provide or otherwise make accessible child pornography.

9. Evidence of any online storage, e-mail, or other remote computer storage subscription to include unique software of such subscription, user logs or archived data that show connection to such service, and user login and passwords for such service.

10. Items of personal property and other evidence tending to identify the person(s) in residence, occupancy, control, or ownership of the premises authorized to be searched by this warrant, including but not limited to letters, canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills.

11. Records or other items, in whatever form, media, or format evidencing ownership or use of computer equipment and paraphernalia found in the premises to be searched, including, but not limited to, sales receipts, registration records, records of payment for Internet access, records of payment for access to newsgroups or other online subscription services, handwritten notes, e-mail messages, and computer files.

12. Records of access to, or use of, online accounts in the name of Andrew Bailey.

13. Computer files bearing the following titles:

a. Pedo 8yr Brazilian girl.mpg
b. Pedo Doctor.avi
c. PEDO-1.mpg
d. pedo long vid.mpg
e. Childlover_little_Collection_Video_0080.mpg
f. Pedo babyj_ass fuck.mpg
g. Pedo.mpg
h. dorm Pédo.mpg
i. 0039.mpg

j. babyj-Dog cums in 10yo.mpg
k. Babyj-14.mpg
l. TOTAL ILEGAL PEDO.mpg
m. VJ1.mpg
n. Raygold Thai Hooker.mpg
o. raygold long video.avi
p. RAPE-cop in Dacula Georgia rapes a 12 yr old.mpeg
q. PEDO-1.mpg
r. Pedo-childlover_anya complete_12m32s.mpg
s. Lolitas-Mamadas_04.mpg
t. kiddy--Vanessa (12yrs) (36.6MB)(3).mpg
u. Kiddy wow.mpg
v. Childlover_little_Collection_Video_0099.avi
w. bd sm bdsm_torture_slave bondage (1.59mins-low quality).mpg
x. BabyJ-Long.mpg
y. (Pedo) Cas-3-5.mpg
z. boy.kiddy.pedo.01.mpeg.mpeg
aa. babyj ass fuck.mpg
bb. Babyj-babycum.mpeg

14. Evidence of the usage of "Fast Track" or other peer to peer software to transfer or receive files containing child pornography, including software, and logs showing the dates and times of transmission of such files.

SEALED
BY ORDER OF THE COURT

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

AO 106 (Rev. 7/87) Affidavit for Search Warrant

SEP 10 2004

# United States District Court

at 1 o'clock and 28 min. P
WALTER A.Y.H. CHINN, CLERK

DISTRICT OF HAWAII

In the Matter of the Search of
(Name, address or brief description of person, property or premises to be searched)

94-1213 Oli Loop
Waipahu, Hawaii 96797

## APPLICATION AND AFFIDAVIT FOR SEARCH WARRANT

CASE NUMBER: Mag. No. 04-614 LEK

I SIAVE P. IAFETA being duly sworn depose and say:

I am a(n) Special Agent with the United States Immigration and Customs Enforcement and have reason to believe
Official Title

that ☐ on the person of or ☒ on the property or premises known as (name, description and/or location)
See Attachment "A" attached to the affidavit attached hereto, and which is incorporated by reference.

in the District of Hawaii
there is now concealed a certain person or property, namely (describe the person or property to be seized)
See Attachment "B" attached to the affidavit attached hereto, and which is incorporated by reference.

which is (state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)
See affidavit attached hereto, and which is incorporated by reference.

concerning a violation of Title 18 United States code, Section(s) 2252 and 2252A.
The facts to support a finding of Probable Cause are as follows:
See affidavit attached hereto, and which is incorporated by reference.

Continued on the attached sheet and made a part hereof. ☒ Yes ☐ No

Signature of Affiant

Sworn to before me, and subscribed in my presence

09-10-2004 at Honolulu, Hawaii
Date City and State

Leslie E. Kobayashi, United States Magistrate Judge
Name and Title of Judicial Officer

Signature of Judicial Officer

SEAL

AGENT'S AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

SIAVE P. IAFETA, being first duly sworn, deposes and states as follows:

INTRODUCTION AND PREMISES TO BE SEARCHED

1. I am a Special Agent with the Department of Homeland Security, United States Immigration and Customs Enforcement (ICE) Office of Investigation, Honolulu, Hawaii, and have been so employed since October 2003. Prior to that I was an Immigration Inspector from April 2002 to October 2003. During the course of my duties as an inspector and a special agent, I have personally conducted and participated in investigations of criminal violations which are set forth in the Immigration and Nationality Act (INA). In August 2004, I successfully completed the ICE Academy Course in Glynco, Georgia. At the ICE Academy I received training in the investigation of various criminal offenses, including offenses involving child pornography and the sexual exploitation of children.

2. Title 18, United States Code, Section 2252 (a)(1) prohibits a person from knowingly transporting or shipping in interstate or foreign commerce, by computer or mail, any visual depiction of minors engaged in sexually explicit conduct. Under Title 18, United States Code, Section 2252(a)(2), it is a crime for any person to knowingly receive or distribute, by computer or mail, any visual depiction of minors engaged in sexually explicit conduct that has been mailed or shipped or transported in interstate or foreign commerce. That section also makes it a federal crime for any person to knowingly reproduce any visual depiction of minors engaging in sexually explicit conduct for distribution interstate or foreign commerce by any means, including by computer or the mail. Under Title 18, United States Code, Section 2252(a)(4), it is also a crime for a person to possess one or more books, magazines, periodicals, films, or other materials which contain visual depictions of minors engaged in sexually explicit conduct that have been transported in interstate or foreign commerce.

3. I am investigating the activities of Andrew Bailey of Waipahu, Hawaii. As will be shown below, there is probable cause to believe that Bailey has distributed, and currently possesses, child pornography, in violation of Title 18, United States Code, Sections 2252 and 2252A. I am submitting this affidavit in support of a search warrant authorizing a search of Bailey's residence, which is located at 94-1213 Oli Loop; Waipahu, Hawaii 96797(hereinafter the "subject premises"), and is more particularly described in Attachment "A" hereto, for the items specified in Attachment "B" hereto, which items constitute instrumentalities, fruits, and evidence of the foregoing violations. I am requesting authority to search the entire subject premises, including the residential dwelling and any

computer and computer media located therein where the items specified in Attachment "B" may be found.

4. The statements contained in this affidavit are based on my own investigative efforts or, where indicated, information provided by others. Since this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence of violations of Title 18, United States Code, Sections 2252 and 2252A, are located at the above premises.

**DEFINITIONS**

5. "Child Erotica" are materials or items that are sexually arousing to pedophiles but that are not in and of themselves obscene or which not necessary depict minors in sexually explicit poses or positions. Child erotica is defined as follows:

> Any material, relating to children, that is sexually arousing to a given individual... Some of the more common types of child erotica include photographs that are not sexually explicit, drawings, sketches, fantasy writings, diaries, and sexual aids.

6. "Child Pornography," as used in this affidavit, shall have the definition set forth in 18 U.S.C. section 2256(8), and shall include any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct. See 18 U.S.C. sections 2252 and 2256 (2).

7. The term "computer," as used herein, is defined pursuant to Title 18, United States Code, Section 1030 (e)(1), as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device."

8. "IP address" refers to a unique number used by a computer to access the Internet. IP addresses can be dynamic, meaning that the Internet Service Provider (ISP) assigns a

different unique number to a computer every time it accesses the Internet. IP addresses might also be static, if an ISP assigns a computer a particular IP address, which is used each time the computer accesses the Internet.

9. The terms "records," "documents," and "materials" include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, painting), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies), mechanical form (including, but not limited to, phonograph records, printing, typing) or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devises such as floppy diskettes, hard disks, CD-ROMS, digital video disks (DVDs), Personal Digital Assistants (PDAs), Multi Media Cards (MMCs), memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, Bernoulli drives, or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device).

10. "Sexually explicit conduct" means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any person(s). See Title 18, United States Code, Section 2256.

11. "URL" or "Uniform Resource Locator" refers to an Internet address. Each file on the Internet has a unique address called a Uniform Resource Locator, more commonly known as URL.

12. "Visual depictions" include undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image. See Title 18, United States Code, Section 2256(5).

USE OF COMPUTERS WITH CHILD PORNOGRAPHY

13. Computers and computer technology have revolutionized the way in which individuals interested in child pornography interact with each other. Child pornography formerly was produced using cameras and film (either still photography or movies). The photographs required darkroom facilities and a significant amount of skill in order to develop and reproduce the images. There were definable costs involved with the production of pornographic images. To distribute these on any scale required significant resources. The distribution usually

required a combination of personal contacts, mailing and telephone calls.

14. The development of computers has changed this. Computers basically serve four functions in connection with child pornography: production, communication, distribution, and storage.

15. Child pornographers can now transfer photographs from a camera onto a computer-readable format with a device known as a scanner. With the advent of digital cameras, the images can now be transferred directly onto a computer. A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection. Electronic contact can be made to literally millions of computers around the world.

16. The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. The size of the electronic storage media (commonly referred to as the hard drive) used in home computers has grown tremendously within the last several years. These drives can store thousands of images at very high resolution.

17. The Internet and its World Wide Web afford collectors of child pornography several different venues for obtaining, viewing and trading child pornography in a relatively secure and anonymous fashion.

18. Collectors and distributors of child pornography also use online resources to retrieve and store child pornography, including services offered by Internet Portals such as Yahoo! and Hotmail, among others. The online services allow a user to set up an account with a remote computing service that provides e-mail services as well as electronic storage of computer files in any variety of formats. A user can set up an online storage account from any computer with access to the Internet. Evidence of such online storage of child pornography is often found on the user's computer. Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer in most cases.

19. As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes. Storing this information can be intentional, i.e., by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files. Digital information can also be retained unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or ISP client software, among

others). In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. A forensic examiner often can recover evidence suggesting whether a computer contains peer-to-peer software, when the computer was sharing files, and some of the files, which were uploaded or downloaded. Such information is often maintained indefinitely until overwritten by other data.

20. Computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensic tools. When a person "deletes" a file on a home computer, the data contained in the file does not disappear, but instead remains on the hard drive until overwritten by new data.

21. A growing phenomenon on the Internet is peer to peer file sharing (P2P). P2P file sharing is a method of communication available to Internet users through the use of special software. Computers linked together through the Internet using this software form a network that allows for the sharing of digital files between users on the network. A user first obtains the P2P software, which can be downloaded from the internet. In general, P2P software allows the user to set up file(s) on a computer to be shared with others running compatible P2P software. A user obtains files by opening the P2P software on the user's computer, and conducting a search for files that are currently being shared on the network. Some types of P2P software allow searches to be done by keyword. The results of the keyword search are displayed to the user. The user then selects file(s) from the results for download. The download of a file is achieved through a direct connection between the computer requesting the file and the computer containing the file.

22. For example, a person interested in obtaining child pornographic images would open the P2P application on his/her computer and conduct a search for files using a term such as "preteen sex." The search is sent out over the network of computers using compatible P2P software. The results of the search are returned to the user's computer and displayed. The user selects from the results displayed the file(s) he/she wants to download. The file is downloaded directly from the computer hosting the file. The downloaded file is stored in the area previously designated by the user. The downloaded file will remain there until moved or deleted.

23. One of the advantages of P2P file sharing is that multiple files may be downloaded in parallel. This means that the user can download more than one file at a time. In addition, a user may download parts of one file from more than one source computer at a time. For example, when downloading an image, a user of the Limewire P2P software may receive parts of the image from multiple computers. The advantage of this is that it speeds up the time it takes to download the file. Often, however, a user of P2P software downloading an image file receives the entire image from one computer.

24. A P2P file transfer is assisted by reference to an Internet Protocol (IP) address. This address, expressed as four numbers separated by decimal points, is unique to a particular computer during an online session. The IP address provides a unique location making it possible for data to be transferred between computers.

25. Software is available to identify the IP address of the P2P computer sending the file and to identify if parts of the file came from one or more IP addresses. Such software monitors and logs Internet and local network traffic.

SPECIFICS OF SEARCHES AND SEIZURES OF COMPUTER SYSTEMS

26. I have consulted with an expert in computer searches, Group Supervisory Special Agent (GS) Richard F. Bratt of ICE. According to GS Bratt, searching and seizing information from computers often requires agents to seize all electronic storage devices (along with related peripherals) to be searched later by a qualified computer expert in a laboratory or other controlled environments. This is true because of the following:

a. Computer storage devices (like hard disks, diskettes, tapes, laser disks, CD-ROMs, DVDs, and Bernoulli drives) can store the equivalent of hundreds of thousands of pages of information. Additionally, a suspect may try to conceal criminal evidence, and he might store criminal evidence in random order or with deceptive file names or deceptive file extensions. This requires searching authorities to examine all the stored data to determine which particular files are evidence or instrumentalities of crime. This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this kind of data search on site.

b. Searching computer systems for criminal evidence is a highly technical process, requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which is expert is qualified to

analyze the system and its data. In any event, data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even "hidden," erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to inadvertent or intentional modification or destruction (both from external sources and from destructive codes imbedded in the system, such as "booby traps"), a controlled environment is essential to its complete and accurate analysis.

27. Based upon my consultation with experts in computer searches, data retrieval from computers and related media, and consultations with other agents who have been involved in the search of computers and retrieval of data from computer systems, I know that searching computerized information for evidence or instrumentalities of crime commonly requires agents to seize all of a computer system's input/output peripheral devices, related software, documentation, and data security devices (including passwords) so that a qualified computer expert can accurately retrieve the system's data in a laboratory or other controlled environment. This is true because of the following:

a. The peripheral devices, which allow users to enter or retrieve data from the storage devices, vary widely in their compatibility with other hardware and software. Many system storage devices require particular input/output (or "I/O" devices in order to read the data on the system. It is important for the analyst to be able to properly re-configure the system as it now operates in order to accurately retrieve the evidence contained therein. In addition, the analyst needs the relevant system software (operating systems, interfaces, and hardware drivers) and any applications software, which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instruction manuals or other documentation and data security devices. If the analyst determines that the I/O devices, software, documentation, and data security devices are not necessary to retrieve and preserve the data after inspection, the government will return them within a reasonable time.

b. In order to fully retrieve data from a computer system, the analyst also needs all magnetic storage devices as well as the central processing unit (CPU). Further, the analyst again needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software that may have been used to create the data (whether stored on hard drives or on external media) for proper data retrieval.

28. In addition, there is probable cause to believe that the computer and its storage devices, the monitor, keyboard, and modem are all instrumentalities of the crimes of receipt, distribution and possession of child pornography, in violation of law, and should all be seized.

CHILD PORNOGRAPHY COLLECTOR CHARACTERISTICS

29. I have discussed this investigation in detail with several law enforcement officials, including GS Bratt who, among others, are responsible for child pornography investigations in the State of Hawaii. GS Bratt has received extensive training from ICE, the United States Customs Service (USCS) and other law enforcement agencies and officials in the area of child pornography and pedophile behavior. Additionally, as the former Child Pornography Investigations coordinator for the USCS, GS Bratt actively pursued and managed hundreds of child pornography investigations. GS Bratt has acquired more than eighty hours of specialized training in the area of child pornography and child sexual abuse through the USCS and the United States Department of Justice. This training focused on methods of investigating child sexual exploitation, child pornography, and obscenity offenses. GS Bratt has worked in the area of child pornography investigations for over 14 years, prior to the use of the Internet by the general public and prior to the advent of "morphing" technology. In addition to case specific training in the area of child exploitation, GS Bratt has received over 240 hours of training in the recovery of computer evidence.

30. Based on his knowledge, training, and experience, GS Bratt has advised me of the following traits and characteristics that are generally found to exist and be true in cases involving individuals who collect child pornography:

a. The majority of individuals who collect child pornography are persons who have a sexual attraction to children. They receive sexual gratification and satisfaction from sexual fantasies fueled by depictions of children that are sexual in nature.

b. The majority of individuals who are sexually attracted to children collect sexually explicit materials involving children, such as photographs, magazines, video tapes, books, slides and other computer images for their own sexual gratification. The most common method of acquiring the material is by trading the materials with other people with similar interests.

c. Since sex with children and the collection of child pornography is illegal, pedophiles desire privacy, anonymity, and a means to avoid detection by law enforcement.

Bailey discovery 000000009

The use of computers by pedophiles to traffic, trade, and collect child pornography and obscenity is a growing phenomenon. An individual familiar with computers can utilize the computer's ability to interact with many distant individuals while remaining largely hidden. This sense of privacy and secrecy along with the ability to interact with many individuals without risk of easy identification satisfies the needs of individuals who are interested in trafficking, trading, and collecting child pornography.

d. Individuals involved in the collection of child pornography **RARELY, IF EVER**, dispose of their sexually explicit material. Such materials are instead treated as prized possessions, which can be viewed or traded over a long period of time. It is further unlikely that the condition of those items depicting the sexual exploitation of children will be altered or damaged from the original condition at the time of receipt based on the desire to keep the items in the original condition. Moreover, taken together, the increased sense of security which a computer affords and the known desire to retain child pornography and other prohibited obscenities for long periods provide probable cause to believe that computer images will be retained for as long as other types of child pornography. During the execution of numerous search warrants, law enforcement officers have found that pedophiles who store child pornography on their computers typically retain the images indefinitely.

e. Individuals involved in the sexual exploitation of children often collect books, magazines, newspapers, letters, and other materials relating to children. Such individuals also collect other written material on the subject of sexual activities with children, which range from fantasy to medical, sociological, psychological, and psychiatric writings. Such contact, correspondence, or writings can and are now done by computer as well as through the use of mails or telephone. They rarely destroy these materials because of the psychological support and reinforcement they provide; the materials tend to validate each pedophile's interest by making that person feel his/her interests are normal rather than deviant.

f. Individuals involved in the collection and distribution of child pornography almost always maintain and possess their materials in a place considered secure, most frequently within the privacy and security of their own homes. As discussed above, child pornography, obscenity, or related materials may also be stored in a computer that may be additionally protected by passwords and other security devices.

g. Individuals who are procurers and distributors of child pornography contrary to law, exhibit

similar characteristics and will maintain their pictures, films, correspondence, and photographs in a secure place, most often a residence, to avoid detection by law enforcement. I also know that child pornography is not lawfully available in retail establishments and that person(s) who wish to obtain child pornography do so by ordering it abroad or by discreet contact with other individuals who have it available.

h. Individuals who are involved with child pornography will often collect, read, copy, or maintain numbers or lists of persons who have similar sexual interests. These contacts are maintained as a means of personal referral, exchange, and commercial profit. These names may be maintained in the original publication or mode of receipt, in phone books, notebooks, scraps of paper, or in computers.

i. Individuals who receive, transport, possess, and distribute child pornography, contrary to law, often keep records of their involvement with such activities, and these records include but are not limited to associate names and addresses, the identity and location of assets illegally gained through criminal activity, child erotica and material used to create, receive, transport, possess, distribute, and sell child pornography.

FACTUAL BACKGROUND OF THE INVESTIGATION

31. This application for a search warrant authorizing a search of Andrew Bailey's residence grows out of a referral from Intel Research Specialist (IRS) Alexis Slebodnick of the ICE Cyber Crimes Center (C3). As will be described below, IRS Slebodnick advised the ICE office in Honolulu of an operation called "Operation Enea," during which a computer located at Bailey's residence was determined to be sharing child pornography files over the Internet through P2P software. Based on discussions with ICE agents who investigate child pornography offenses, and a review of investigative reports, I believe there is probable cause to believe that evidence of various child pornography offenses is presently located in a computer and related storage media at Bailey's residence. The investigation may be summarized as follows.

32. IRS Slebodnick has advised that the ICE Cyber Crimes Center (C3) and the Federal Bureau of Investigation (FBI) have identified persons in the United States suspected of trafficking child pornography over the Internet through an international investigation called "Operation Enea." Operation Enea was a peer-to-peer investigation conducted by the Norwegian Police and the Danish National Police. According to the investigative reports, the operation was aimed at identifying persons who were sharing child pornography over "FastTrack," a

worldwide file-sharing network. As with other P2P networks, the FastTrack networks enables users to install software and then exchange files containing pictures, videos and music globally. Each user has the ability to determine which files on his hard disk are made available to others over the network. When a user connects to the network, the information about each shared file is stored on central servers called "supernodes." The supernodes in turn consist of computers that meet specific requirements concerning bandwidth, and contain lists of files, which each connected user made accessible over the network. The information includes file names and "hash values," or unique mathematical values equivalent to an electronic fingerprint. Through the use of hash values, investigators are able to determine that certain files are identical.

33. When a user searches for files on the FastTrack network, the request is sent to the supernode to which the user is connected. The user then receives an index of users sharing the requested material. The supernodes also store user names selected by the particular users, as well as IP addresses used to make connections to the network. Once a user selects a file for downloading, the downloading does not occur through the supernode. A user instead establishes a direct peer-to-peer connection with the host computer, and downloads the file directly.

34. In anticipation of the operation, the Danish and Norwegian law enforcement authorities prepared a database of hash values of pictures and videos known to constitute child pornography. The authorities reviewed files seized in prior criminal cases in Norway, as well as files contained in databases maintained by Interpol and other foreign authorities. An undercover officer then searched the FastTrack network by using keywords frequently used in connection with child pornography.

35. On March 27, 2004, at approximately 18:10:02 Greenwich Mean Time (GMT)+0100, ENEA Investigator Kvinnegaard of the Norway National Criminal Investigation Service conducted a search using the term "Underage. Investigator Kvinnegaard saw that a computer connected to the network via IP address 24.161.147.253 had multiple files responsive to his search. A screen capture was taken of the search and of the files available from IP address 24.161.147.253.

36. Enea Investigator Kvinnegaard then downloaded twenty-eight (28) files from the IP address 24.161.147.253 bearing the following file names:

a. Pedo 8yr Brazilian girl.mpg
b. Pedo Doctor.avi
c. PEDO-1.mpg

d. pedo long vid.mpg
e. Childlover_little_Collection_Video_0080.mpg
f. Pedo babyj_ass fuck.mpg
g. Pedo.mpg
h. dorm Pédo.mpg
i. 0039.mpg
j. babyj-Dog cums in 10yo.mpg
k. Babyj-14.mpg
l. TOTAL ILEGAL PEDO.mpg
m. VJ1.mpg
n. Raygold Thai Hooker.mpg
o. raygold long video.avi
p. RAPE-cop in Dacula Georgia rapes a 12 yr old.mpeg
q. PEDO-1.mpg
r. Pedo-childlover_anya complete_12m32s.mpg
s. Lolitas-Mamadas_04.mpg
t. kiddy--Vanessa (12yrs) (36.6MB)(3).mpg
u. Kiddy wow.mpg
v. Childlover_little_Collection_Video_0099.avi
w. bd sm bdsm_torture slave bondage (1.59mins-low quality).mpg
x. BabyJ-Long.mpg
y. (Pedo) Cas-3-5.mpg
z. boy.kiddy.pedo.01.mpeg.mpeg
aa. babyj ass fuck.mpg
bb. Babyj-babycum.mpeg

37. IP address 24.161.147.253 was traced through a search of Arin Whois, an online database containing records revealing who owns an IP address. The trace revealed that the IP address belonged to ROADRUNNER-HAWAII2 in the United States. Roadrunner, which is owned by Time Warner Cable, is an Internet Service Provider operating in Hawaii.

38. On June 3, 2004, ICE Analyst Alexis Slebodnick served an administrative subpoena to Time Warner Cable, requesting the identification of, and account information pertaining to, the user of IP address 24.161.147.253 at the time the files were downloaded. On July 30, 2004, Time Warner Cable responded via facsimile, that the subscriber using the IP address 24.161.147.253 on March 27, 2004, at 18:10:02 GMT+0100 was Andrew Bailey, at 94-1213 Oli-Loop, Waipahu, Hawaii 96734, with telephone number (808) 678-0031, and username of baileya001.chelle.

39. On or about August 30, 2004, ICE, Office of the Special Agent in Charge (SAC) Honolulu received a compact disk containing the 28 videos and the screen capture of the search and file titles. I have reviewed the 28 videos and determined them to be child pornography as defined in Title 18, United States Code,

Section 2256, that is, visual depictions of minors engaged in sexually explicit conduct, including intercourse, masturbation, and the lascivious exhibition of the genitals or pubic area, or depictions indistinguishable from minors engaged in such conduct.

40. I have also reviewed the list of files, which the Enea Investigator determined were available from IP address 24.161.147.253 at the time of the download. The computer using that address appeared to be sharing 241 files relating to music and pornography. In addition to the 28 files which were downloaded, the computer was sharing the following:

a. Little_oral_annie_b.mpg
b. Japanese girl hard sex DVD.HQ mpg 13yo rape and crying
c. 0039.mpg, TVG013 12yrs youngporn, kiddy, bondage
d. zadoom pedo man fuck boy 8yr.WMV
e. assedteen5.mpg
f. BabyJ-Teddy.mpg
g. BabyJ-Mine.mpg
h. BabyJ Mine-avi

41. Based on prior investigations of other ICE Agents and my training, I believe these file titles are indicative of child pornography. For example, I know that "young porn" and "pedo" are phrases frequently used to denote child pornography.

42. On August 30, 2004, an administrative subpoena was issued to Time Warner Cable, requesting subscriber account information pertaining to Andrew Bailey. On September 1, 2004, Time Warner indicated that Andrew Bailey began receiving Roadrunner Residential service on December 23, 1998, and that the service was still active. Time Warner indicated that Roadrunner service is being provided to Andrew Bailey at 94-1213 Oli Loop, Waipahu, Hawaii 96797, and that Andrew Bailey maintains a telephone number of (808) 678-0031.

43. I know from prior investigations by other ICE Agents and my personal experience that Time Warner Cable offers Oceanic Road Runner Internet service to residential customers. The Oceanic Road Runner service provides Internet access to residential customers through cable connection (rather than dial-up), with the computer used for the Internet access connected through a cable modem to a cable line that is run directly to the subscriber's residence. Based on this information, I believe there is probable cause to believe that a computer, modem, and associated equipment are presently located at 94-1213 Oli Loop, Waipahu, Hawaii 96797.

44. I have searched various record indices for information on Andrew Bailey. ChoicePoint database indicates that Andrew Bailey also known as Bailey, Andrew H, had a residential address of 94-1213 Oli Loop, Waipahu, Hawaii 96797, as of February 2004. According to the United States Postal Service, mail was being delivered to Andrew Bailey at 94-1213 Oli Loop, Waipahu, Hawaii 96797, as of September 2, 2004. State of Hawaii records reflect that Andrew Bailey, social security number 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, date of birth February 21,1976, has a driver's license which expires on February 2, 2005, with a mailing address of 94-1213 Oli Loop, Waipahu, Hawaii 96797.

45. On September 3, 2004, I drove past 94-1213 Oli Loop, Waipahu, Hawaii 96797. The residence at that address is described in Attachment "A" hereto. I observed a Blue Dodge four-Door Sedan parked in the roadside of the residence (Hawaii License NBG729). The Sedan is registered to Andrew Bailey at 94-1213 Oli Loop, Waipahu, Hawaii 96797.

46. Based on his review of the investigative materials, GS Bratt has advised me that, in his opinion, Andrew Bailey (or a person in his household) fits the profile of a collector of child pornography, as described in this affidavit. GS Bratt bases this opinion on the following:

a. Investigators downloaded 28 video files containing child pornography from Bailey's computer, and saw that his computer contained at least 8 additional files whose titles were indicative of child pornography;

b. The user of Bailey's computer employed peer to peer software enabling files to be uploaded and downloaded; and

c. Persons who use peer to peer software to share child pornography typically retain images to be traded with others.

47. GS Bratt further believes that, for the reasons stated elsewhere in this affidavit, evidence of the distribution, receipt and possession of child pornography will be found on Bailey's computer and/or storage media. In his opinion, Bailey's use of FastTrack to share files suggests that his file collection will be fluid and change depending on which files have recently been downloaded or uploaded. Based on my experience and GS Bratt's experience, persons who use P2P networks frequently download materials and then sort them into directories where they are stored more permanently. GS Bratt also believes that, given the number of child pornographic files previously seen on Bailey's computer, such files (or remnants of them) are probably still on his computer.

WHEREFORE, based upon the foregoing, I believe that there is probable cause to believe that at the residence of Andrew Bailey, described in Attachment "A" hereto, there are presently located the specific items in Attachment "B" hereto, which items constitute evidence of the commission of criminal offenses, namely, violations of Title 18 United States Code, Sections 2252 and 2252A, contraband, the fruits of crimes, or other things otherwise criminally possessed, or property which is or has been used as the means of committing the foregoing offenses.

FURTHER AFFIANT SAYETH NAUGHT.

Siave Iafeta
Special Agent
Immigration and Customs Enforcement

Subscribed and sworn to
before me on September 10, 2004

LESLIE E. KOBAYASHI
United States Magistrate Judge

SEAL

**ATTACHMENT "A"**

**PREMISES TO BE SEARCHED**

The residence of Andrew Bailey, located at 94-1213 Oli Loop, Waipahu, Hawaii 96797. The residence is a two-story single family home. The residence is the last house on the right corner of Ukee Street and Oli Loop, facing Ewa side. The house is light brown with dark brown trim and brown shingle type roofing. There is a white-grey mailbox bearing the numbers "94-1213" affixed in black and Silver.

**ATTACHMENT "B"**

**LIST OF ITEMS TO BE SEIZED**

1. Any computers, including desktop computers and laptop computers, and storage devices such as hard drives, zip disks, CDs, and floppy disks, that were or may have been used as a means to provide images of child pornography over the Internet in violation of Title 18, United States Code, Sections 2252 and 2252A.

2. All materials, in whatever form, media, or format, including computer files, prints, videos, videotapes, photographs, negatives, magazines, and books, which contain child pornography, child erotica, or the visual depictions of minors engaged in sexually explicit conduct, or computer generated images that are indistinguishable from visual depictions of minors engaged in sexually explicit conduct, as defined in Title 18, United States Code, Sections 2252, 2252A and 2256.

3. Any electronic data processing and storage devices, computers and computer systems, all tapes, cassettes, cartridges, streaming tape, commercial software and hardware, computer disks, disk drives, monitors, computer printers, modems, tape drives, disk application programs, data disks, system disk operating systems, magnetic media floppy disks, tape systems and hard drive, terminals (keyboards and display screens) and other computer related operation equipment, computer photographs, and digital graphic file format equipment that may contain, or be used to contain, any child pornography, visual depictions of minors engaged in sexually explicit conduct, or child erotica, or information pertaining to sexual interest in child pornography or child erotica, to sexual activity with children, or to the distribution, possession, or receipt of child pornography or child erotica.

4. Any and all computer software, including programs to run operating systems, applications (like word processing, graphics, or spreadsheet programs), utilities, compilers, interpreters, and communications program.

5. Any computer-related documentation, which consists of written, recorded, printed or electronically stored material that explains or illustrates how to configure or use computer hardware, software, or other related items.

6. Any and all records and materials, in whatever form, media, or format (including, but not limited to, envelopes, letters, papers, e-mail, chat logs and electronic messages, other digital data files and web cache information) (a) pertaining to the possession, receipt, or distribution of child pornography or the visual depictions of minors engaged in sexually explicit conduct; (b) identifying persons transmitting through interstate or foreign commerce, including via computer, any child

pornography or visual depiction of minors engaged in sexually explicit conduct; or (c) bearing on the receipt, shipment, or possession of child pornography or the visual depictions of minors engaged in sexually explicit conduct.

7. Records of communication (as might be found, for example, in digital data files) between individuals concerning the topic of child pornography, the existence of sites on the Internet that contain child pornography or which cater to those with an interest in child pornography, as well as evidence of membership in online clubs, groups, services, or other Internet sites that provide or make accessible child pornography to its members and constituents.

8. Evidence of association, by use, subscription or free membership, with online clubs, groups, services, or other Internet sites that provide or otherwise make accessible child pornography.

9. Evidence of any online storage, e-mail, or other remote computer storage subscription to include unique software of such subscription, user logs or archived data that show connection to such service, and user login and passwords for such service.

10. Items of personal property and other evidence tending to identify the person(s) in residence, occupancy, control, or ownership of the premises authorized to be searched by this warrant, including but not limited to letters, canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills.

11. Records or other items, in whatever form, media, or format evidencing ownership or use of computer equipment and paraphernalia found in the premises to be searched, including, but not limited to, sales receipts, registration records, records of payment for Internet access, records of payment for access to newsgroups or other online subscription services, handwritten notes, e-mail messages, and computer files.

12. Records of access to, or use of, online accounts in the name of Andrew Bailey.

13. Computer files bearing the following titles:

a. Pedo 8yr Brazilian girl.mpg
b. Pedo Doctor.avi
c. PEDO-1.mpg
d. pedo long vid.mpg
e. Childlover_little_Collection_Video_0080.mpg
f. Pedo babyj_ass fuck.mpg
g. Pedo.mpg
h. dorm Pédo.mpg
i. 0039.mpg