Case 1:05-cr-00278-DAE  Document 34-7  Filed 04/09/2006  Page 1 of 29



# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
### NORTHERN DIVISION

IN THE MATTER OF THE
SEARCH OF:

Case No. 2:04-mj-40

1512 24th Avenue
Menominee, Michigan 49858

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Jay D. Johnston, being duly sworn, depose and state:

1.     I am a Special Agent with the Federal Bureau of Investigation (FBI), assigned to the

Marquette, Michigan Resident Agency. I have been so employed since September 14, 1997. As

part of my daily duties as an FBI agent, I investigate criminal violations relating to child exploitation

and child pornography including violations pertaining to the illegal production, distribution, receipt

and possession of child pornography, in violation of 18 U.S.C. §§ 2252 and 2252A. I have received

training in the area of child pornography and child exploitation, and have had the opportunity to

observe and review numerous examples of child pornography (as defined in 18 U.S.C. § 2256)[1] in

all forms of media including computer media. I have also participated in the execution of multiple

---

[1] "Child Pornography means any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where – (A) the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct; . . . [or] (C) such visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaging in sexually explicit conduct." For conduct occurring after April 30, 2003, the definition also includes "(B) such visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from that of a minor engaging in sexually explicit conduct." 18 U.S.C. § 2256(8).

1



search warrants, of which approximately four search warrants have involved child exploitation and/or child pornography offenses.

2.   This Affidavit is made in support of an application for a warrant to search the entire premises located at 1512 24th Avenue, Menominee, Michigan 49858 (hereinafter, the "SUBJECT PREMISES"). The SUBJECT PREMISES to be searched is more particularly described as: a two story single family home, with gray vinyl siding and an attached single car garage. The numbers 1512 are written on the east side of the residence, near the front door. The residence has a pool in the back yard. There is also a 1994 Dodge Spirit, bearing Michigan registration 09BMU. Records of the Michigan Secretary of State indicates that the vehicle is registered to John and Jean Casselbury. The residence is located on the northeast corner of 24th Avenue and 16th Avenue, in Menominee, Michigan.

3.   The purpose of this application is to seize evidence of violations of 18 U.S.C. §§ 2252 and 2252A, which among other things make it a crime to possess and distribute child pornography in interstate commerce by computer.

4.   I am familiar with the information contained in this Affidavit based upon the investigation I have personally conducted and based on my conversations with other law enforcement officers involved in this investigation.

5.   Because this Affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only those facts that I believe are necessary to establish probable cause to believe that evidence of violations of 18 U.S.C. §§ 2252 and 2252A are located at the SUBJECT PREMISES and within a computer and related peripherals, and computer media found at the SUBJECT

2

PREMISES. Where statements of others are set forth in this Affidavit, they are set forth in substance and in part.

6.    As a result of the instant investigation described more fully below, there is probable cause to believe that evidence, fruits, and instrumentalities of violations of federal law, including 18 U.S.C. §§ 2252 and 2252A, are present at the SUBJECT PREMISES.

7.    The instant investigation has revealed that an individual assigned the Internet Protocol address ("IP address") 24.208.39.42 on March 27, 2004, at 20:10:44 GMT +0100 subsequently identified as John A. Casselbury, possessed child pornography on a computer that is located at the SUBJECT PREMISES and made child pornography available to other computer users using peer-to-peer file sharing software installed on that computer. Paragraphs 8 through 13 explain computer-related technical terms and concepts relevant to this investigation. Paragraphs 14 and 15 explain how computers and computer technology have revolutionized the way in which child pornography is produced, utilized and distributed. The information set forth in paragraphs 16 through 25 provide background concerning the underlying undercover investigation undertaken through cooperation between the Norwegian and Danish national police through which the lead to the SUBJECT PREMISES was developed. Finally, paragraphs 27 through 36 describe, more particularly, the investigation of the SUBJECT PREMISES.

### The Internet and Definitions of Technical Terms Pertaining to Computers and Peer-to-Peer File Sharing

8.    As part of my training, I have become familiar with the Internet, which is a global network of computers[2] and other electronic devices that communicate with each other using various

---

[2] **Computer:** The term "computer" is defined by 18 U.S.C. § 1030(e)(1) to mean "an electronic, magnetic, optical, electrochemical, or other high speed data processing device

3

means, including standard telephone lines, high-speed telecommunications links (e.g., copper and fiber optic cable), and wireless transmissions, including satellite. Due to the structure of the Internet, connections between computers on the Internet routinely cross state and international borders, even when the computers communicating with each other are in the same state. Individuals and entities use the Internet to gain access to a wide variety of information; to send information to, and receive information from, other individuals; to conduct commercial transactions; and to communicate via electronic mail ("e-mail"). An individual who wants to use the Internet may do so at public locations such as internet cafes or the public library or they may contract privately by obtaining an account with a personal computer that is linked to the Internet--for example, through a university, an employer, or a commercial service--which is called an "Internet Service Provider" or "ISP" (see definition of "Internet Service Provider" below).

9.     A growing phenomenon on the Internet is peer-to-peer (P2P) file sharing. P2P file sharing is a method of communication available to Internet users through the use of special software. Computers linked together through the Internet using P2P software form a network that allows for the sharing of digital files between users on the network. The network changes its configuration each time an individual user signs on or off the file sharing network. In order to participate in P2P file sharing, a user first obtains the P2P software, which can be downloaded from the internet. In general, P2P software allows the user to set up a folder in which the user may place digital files to be shared with other computer users who are running compatible P2P software. The P2P software

---

performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device, but such term does not include an automated typewriter or typesetter, a portable hand held calculator, or other similar device."

creates a file list showing all the files the individual has placed in the folder of materials to be shared. The user sharing a particular file can associate a listing of key words with the file to facilitate searches by other users. A user obtains files from another computer by opening the P2P software on his or her computer, and conducting a search for files that are currently being shared on the network. For example, Kazaa and Kazaalite, two P2P software products, set up their searches by key word. The results of the key word search are displayed to the user. The user then selects files(s) from the search result to download. The download of a file is achieved through a direct connection between the computer requesting the file and the computer containing the file. Unless the user who downloads the file opts to change the key words associated with the file he or she has downloaded, the key words identified by the first user will come with the file.

10.      For example, a person interesting in obtaining child pornography images would open the P2P software program on his or her computer and would conduct a search for files using a term such as "pre-teen sex." That keyword search is sent out over the network of computers running a compatible P2P program. The results of the search are returned to the user's computer and displayed. The user selects from the results displayed the file(s) he or she wants to download. The file is downloaded directly from the computer hosting the file.

11.     One of the advantages of P2P file sharing is that multiple files may be downloaded in parallel. This means that the user can download more than one file at a time. In addition, a user may download parts of one file from more than one source computer at a time. For example, a Kazaa user downloading an image file may actually receive parts of the image from multiple computers, each of which designated that the identical file should be shared. The advantage of this is that it speeds up the time it takes to download the file.

5

12.     A P2P file transfer is assisted by reference to an IP address. This address is unique to a particular computer during an online session. The IP address provides a unique locator making it possible for data to be transferred between computers. Most P2P software does not display the IP address of the person sharing the file to the user. Third party software is available to identify the IP address of the P2P computer sharing a particular file.

13.     Set forth below are some definitions of technical terms, used throughout this Affidavit, and in Attachments A and B hereto, pertaining to the Internet and computers more generally.

    a.     **Computer system and related peripherals, and computer media**: As used in this affidavit, the terms "computer system and related peripherals, and computer media" refer to tapes, cassettes, cartridges, streaming tape, commercial software and hardware, computer disks, CDs, DVDs, disk drives, monitors, computer printers, modems, tape drives, disk application programs, data disks, system disk operating systems, magnetic media floppy disks, hardware and software operating manuals, tape systems and hard drives and other computer-related operation equipment, digital cameras, compact flash cards, scanners, in addition to computer photographs, graphic interchange formats and/or photographs, and other visual depictions of such graphic interchange formats, including, but not limited to, JPG, GIF, TIF, AVI, and MPEG.

    b.     **FastTrack**: A worldwide commercial P2P file-sharing network on the Internet. Through locally installed P2P file sharing software, users all over the world have the opportunity to exchange files. There are several P2P file sharing programs that can access, download and share files on the FastTrack network, such as Kazaa, Kazaalite,

6

Grokster and Imesh. Each user determines which files on his hard disk other users can access. When a user connects to the network, the information about each shared file is stored on central servers, so-called supernodes. These supernodes are computers that meet specific requirements regarding bandwidth and contain lists of the files each connected user has made accessible on the network. The information stored on the supernode is available as long as the user is online and contains information such as the file name and a hash value for each of the shared files. When a user searches a file on the FastTrack network, the request is sent to the supernode to which the user is connected, and he immediately receives an index of users sharing the requested material. In the supernode, this information is stored along with the IP address of the actual user.

     c.    **MD5 Hash Value:** A hash value, also known as a message digest, is a mathematical value generated by applying an algorithm to a computer file. Hash values play a role in security systems where they are used to ensure that transmitted messages have not been tampered with. An MD5 hash value is a 16 character hexadecimal value calculated by applying the MD5 algorithm to a computer file. I have consulted with Jerry Barton, a Computer Forensic Specialist with the FBI, who has informed me that among computer forensics professionals, the MD5 hash value is generally considered to be a unique signature or fingerprint for a file.

     d.    **Fast Track Hash Value:** A MD5 hash value generated using the first 300KB (307200 bytes) of data from a file.

     e.    **Internet Service Providers (ISPs) and the Storage of ISP Records:** Internet Service Providers are commercial organizations that are in business to provide individuals

Case 1:05-cr-00278-DAE    Document 34-7    Filed 04/03/2006    Page 8 of 29

and businesses access to the internet. ISPs provide a range of functions for their customers
including access to the Internet, web hosting, e-mail, remote storage, and co-location of
computers and other communications equipment. ISPs can offer a range of options in
providing access to the Internet including telephone based dial-up, broadband based access
via digital subscriber line (DSL) or cable television, dedicated circuits, or satellite based
subscription. ISPs typically charge a fee based upon the type of connection and volume of
data, called bandwidth, that the connection supports. Many ISPs assign each subscriber an
account name–a user name or screen name, an "e-mail address," an e-mail mailbox, and a
personal password selected by the subscriber. By using a computer equipped with a modem,
the subscriber can establish communication with an ISP over a telephone line, through a
cable system or via satellite, and can access the Internet by using his or her account name and
personal password. ISPs maintain records ("ISP records") pertaining to their subscribers
(regardless of whether those subscribers are individuals or entities). These records may
include account application information, subscriber and billing information, account access
information (often times in the form of log files), e-mail communications, information
concerning content uploaded and/or stored on or via the ISP's servers, and other information,
which may be stored both in computer data format and in written or printed record format.
ISPs reserve and/or maintain computer disk storage space on their computer system for their
subscribers' use. This service by ISPs allows for both temporary and long-term storage of
electronic communications and many other types of electronic data and files. Typically, e-
mail that has not been opened by an ISP customer is stored temporarily by an ISP incident
to the transmission of that e-mail to the intended recipient, usually within an area known as

the home directory. Such temporary, incidental storage is defined by statute as "electronic storage," see 18 U.S.C. § 2510(17), and the provider of such a service is an "electronic communications service." An "electronic communications service," as defined by statute, is "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15). A service provider that is available to the public and provides storage facilities after an electronic communication has been transmitted and opened by the recipient, or provides other long term storage services to the public for electronic data and files, is defined by statute as providing a "remote computing service." 18 U.S.C. § 2711(2).

f.   **IP Address:** Every computer or device on the Internet is referenced by a unique Internet Protocol address the same way every telephone has a unique telephone number. An IP address is a series of four numbers separated by a period, and each number is a whole number between 0 and 254. An example of an IP address is 192.168.10.102. Each time an individual accesses the Internet, the computer from which that individual initiates access is assigned an IP address. A central authority provides each ISP a limited block of IP addresses for use by that ISP's customers or subscribers. Most ISP's employ dynamic IP addressing, that is they allocate any unused IP address at the time of initiation of an Internet session each time a customer or subscriber accesses the Internet. A dynamic IP address is reserved by an ISP to be shared serially among a group of computers over a period of time. The ISP logs the date, time and duration of the Internet session for each IP address and can identify the user of that IP address for such a session from these records. Typically, users who sporadically access the Internet via a dial-up modem will be assigned

an IP address from a pool of IP addresses for the duration of each dial-up session. Once the session ends, the IP address is available for the next dial-up customer. On the other hand, some ISP's, including most cable providers, employ static IP addressing, that is a customer or subscriber's computer is assigned one IP address that is used to identify each and every Internet session initiated through that computer. In other words, a static IP address is an IP address that does not change over a period of time and is typically assigned to a specific computer.

## Computers and Child Pornography

14.    Based upon my knowledge, training, and experience in child exploitation and child pornography investigations, and the experience and training of other law enforcement officers with whom I have had discussions, computers and computer technology have revolutionized the way in which child pornography is produced, distributed and utilized. Prior to the advent of computers and the Internet, child pornography was produced using cameras and film, resulting in either still photographs or movies. The photographs required darkroom facilities and a significant amount of skill in order to develop and reproduce the images. As a result, there were definable costs involved with the production of pornographic images. To distribute these images on any scale also required significant resources. The photographs themselves were somewhat bulky and required secure storage to prevent their exposure to the public. The distribution of these wares was accomplished through a combination of personal contacts, mailings, and telephone calls, and compensation for these wares would follow the same paths. More recently, through the use of computers and the Internet, individuals who distribute child pornography over the internet use P2P file sharing software to conduct the transfer of the materials, allowing them to remain relatively anonymous.

10

15.    In addition, based upon my own knowledge, training, and experience in child exploitation and child pornography investigations, and the experience and training of other law enforcement officers with whom I have had discussions, the development of computers has also revolutionized the way in which child pornography collectors interact with, and sexually exploit, children. Computers serve four basic functions in connection with child pornography: production, communication, distribution, and storage. More specifically, the development of computers has changed the methods used by child pornography collectors in these ways:

a.    Producers of child pornography can now produce both still and moving images directly from a common video or digital camera. The camera is attached, using a device such as a cable, or digital images are often uploaded from the camera's memory card, directly to the computer. Images can then be stored, manipulated, transferred, or printed directly from the computer. Images can be edited in ways similar to how a photograph may be altered. Images can be lightened, darkened, cropped, or otherwise manipulated. The producers of child pornography can also use a device known as a scanner to transfer photographs into a computer-readable format. As a result of this technology, it is relatively inexpensive and technically easy to produce, store, and distribute child pornography. In addition, there is an added benefit to the pornographer in that this method of production does not leave as large a trail for law enforcement to follow.

b.    The Internet allows any computer to connect to another computer. Electronic contact can be made to literally millions of computers around the world.

c.    The Internet allows users, while still maintaining anonymity, to easily locate

i.    other individuals with similar interests in child pornography; and

11

    ii.     websites that offer images of child pornography.

    d.     Child pornography collectors can use standard Internet connections, such as those provided by businesses, universities, and government agencies, to communicate with each other and to distribute child pornography. The may also distribute and collect child pornography materials with P2P file sharing. These communication links allow contacts around the world as easily as calling next door. Additionally, these communications can be quick, relatively secure, and as anonymous as desired. All of these advantages, which promote anonymity for both the distributor and recipient, are well known and are the foundation of transactions between child pornography collectors over the Internet.

16.     The computer's capability to store images in digital form makes it an ideal repository for child pornography. A single floppy disk can store dozens of images and hundreds of pages of text. The size of the electronic storage media (commonly referred to as a hard drive) used in home computers has grown tremendously within the last several years. Hard drives with the capacity of 120 or more gigabytes are not uncommon. These drives can store tens of thousands of images at very high resolution. Magnetic storage located in host computers adds another dimension to the equation. It is possible to use a video camera to capture an image, process that image in a computer with a video capture board, and save that image to storage in another country. Once this is done, there is no readily apparent evidence at the "scene of the crime". Only with careful laboratory examination of electronic storage devices is it possible to recreate the evidence trail.

### Overview of the Underlying Norwegian/Danish Investigation

17.     This investigation originated as a cooperative effort between the Norwegian and Danish national police agencies.

18.    The first step the Norwegian and Danish authorities undertook was the preparation of a database (hereinafter "Norwegian Database") containing images of suspected child pornography and other non-pornographic images from known child pornography series, which they collected from several different international law enforcement agencies.

19.    After collecting electronic copies of the images, the Norwegian and Danish authorities prepared the MD5 hash value for each file in the Norwegian Database. As previously described in Paragraph 13 of this Affidavit, a hash value is a unique mathematical representation of the content of the file. In total, the completed Norwegian Database contained hash values of approximately 850,000 picture and movie files. For files smaller than 300KB, the MD5 hash value was the same as the Fast Track Hash Value. For files larger than 300KB, an additional Fast Track Hash Value was created for each file based on the first 300KB of data from the file.

20.    From March 26, 2004 at 4:00 p.m. to March 28, 2004 at 6:00 p.m., (local Oslo time) agents from the Norwegian National Computer Crime Center, the Norwegian National Criminal Investigative Service, Subdivision for Sexualized Violence and the Danish Police, Subdivision of Forensic Investigation, Computer Crime Section ran an undercover operation from the premises of the National Computer Crime Center of the Norwegian National Authority for Investigation and Prosecution of Economic and Environmental Crime at Bryn in Oslo, Norway.

21.    During the undercover operation, the Norwegian and Danish agents accessed information computer users shared via the FastTrack P2P network using the Kazaalite P2P program. The agents conducting the investigation first conducted a number of key word searches of key words known to be frequently used by individuals involved in trading child pornography over the Internet. The key words included terms that are specifically identified with known child pornography series

13

as well as more general descriptive terms such as "preteen," "underage," "11 y.o.," "child porn," "pedo," "lolitas," "childlover," and "kiddieporn."

22.     After a key word search was conducted, the FastTrack network displayed a list of computer users sharing files over the network with file names that matched the key word search.

23.     In the next step of the investigation, the agents more closely examined the contents of the shared files of the computer users who had been identified during the key word search for child pornography terms.  Those users' files were available over the public network because each computer user had elected to share these files using P2P software.  In order to check whether the identified user's shared files actually contained child pornography, the agents ran a computer program that compared the Fast Track Hash Values of the users' shared files with the Fast Track Hash Values from the Norwegian Database.  By running this program, the agents searched the hash values of files stored in the shared folder on the computers of these users for matches of images contained in the Norwegian Database.

24.     When Fast Track Hash Value matches were found among a particular user's shared files, certain information was collected about the user including:  FastTrack Username; IP address and online date and time; the user's ISP; the keyword(s) that had initially identified the user; the time the investigators retrieved the information about the user; the number of shared files on the user's computer; the number of shared files that matched the Fast Track Hash Values in the Norwegian Database; the corresponding hash values; the size of the matching file on the user's computer; and the size of the matching file as it exists in the database of known child pornography images.  All of this information was placed in a digital file about the user.  Also placed in that file were copies of

14

the child pornography images represented by the hash values that had been matched during the investigation.

25.     Using the method just described, during the fifty hour period of the undercover investigation the Norwegian and Danish Police identified approximately 1300 targets located in the United States whose shared files on the FastTrack network matched seven or more Fast Track Hash Values of images contained in the Norwegian Database.

26.     On April 30, 2004, at a meeting of INTERPOL, the Norwegian and Danish Police presented information about the investigation to representatives from several countries. At that time, representatives of FBI, ICE and the United States Department of Justice were presented with a computer hard drive containing the data from the investigation, including the digital files containing detailed information about the targeted computer users.

### Probable Cause to Search the Subject Premises

27.     Upon receipt of a lead from the FBI Innocent Images, the undersigned affiant commenced an investigation. The undersigned affiant reviewed all of the materials sent from FBI Innocent Images, including the materials collected about the target during the Norwegian/Danish investigation. Among those materials were the user's IP address, which was 24.208.39.42, the time the user had been online during the Norwegian/Danish undercover operation, which was March 27, 2004 at 20:10:44 GMT +0100, the User's ISP, Time Warner Cable (Road Runner), the number of shared files that matched the database of known child pornography images and copies of the child pornography images that had been matched during the investigation. In addition, FBI Innocent Images also provided a subpoena return from the user's ISP.

15

28.    The following is a description of child pornography images matched during the Norwegian/Danish investigation:

    a.    The Norwegian/Danish investigation found a FastTrack Hash Value match a file with the file name of <u>ass & pussy lips (1).jpg</u>. That file depicts a blonde prepubescent minor laying on her stomach with her buttocks and genitalia exposed. (See attachment C)

    b.    The Norwegian/Danish investigation found a FastTrack Hash Value match a file with the file name of <u>daughter and mother do son (1) (1).jpg</u>. That file depicts an adult topless female assisting a prepubescent female to engage in fellatio with a young male. (See attachment D)

    c.    The Norwegian/Danish investigation found a FastTrack Hash Value match a file with the file name of <u>me and Kelly.jpg</u>. That file depicts a prepubescent female being vaginally penetrated by an adult males penis. (See attachment C)

    d.    The Norwegian/Danish investigation found a FastTrack Hash Value match a file with the file name of <u>Mom & Children.jpg</u>. That file depicts an adult woman masturbating a young male and prebuescent female. The young male is kissing the prepubescent female. (See attachment D)

    e.    The Norwegian/Danish investigation found a FastTrack Hash Value match a file with the file name of <u>Mother, son and daughter blowjob.jpg</u>. That file depicts an adult topless female assisting a prepubescent female to engage in fellatio with a young male. (See attachment E)

16

f. The Norwegian/Danish investigation found a FastTrack Hash Value match a file with the file name of <u>pedo-underage daughter eating her mother.jpg</u>. That file depicts a prepubescent female engaging in cuninglingus with an adult female. (See attachment F)

g. The Norwegian/Danish investigation found a FastTrack Hash Value match a file with the file name of <u>Surfer Chick On a Fence Showing Off Her Little Pussy (1) .jpg</u>. That file depicts a prepubescent female, naked from the waist down, sitting on a fence with her genitals exposed. (See attachment G)

29. The subpoena return provided by FBI Innocent Images from Time Warner Cable (Road Runner) showed that the user with IP address 24.208.39.42 who was online on March 27, 2004 at 20:10:44 GMT +0100 was a customer of the ISP identified as John A. Casselbury whose billing address is 1512 24th Avenue, Menominee, Michigan, 49858 – the SUBJECT PREMISES.

30. Time Warner Cable (Road Runner) also confirmed that John A. Casselbury's account was active at the time of the Norwegian/Danish undercover operation; and that John Casselbury gave a telephone number of 906-864-0120.

31. Additional information obtained from the Secretary of State and LexisNexis reveals that John A. Casselbury lives at 1512 24th Avenue, Menominee, Michigan, 49858. A check of the City of Menominee's Building Inspector's computer records indicates that John and Jean Casselbury are listed as the current owners of 1512 24th Avenue, Menominee, Michigan, 49858.

32. Surveillance of the SUBJECT PREMISES revealed that on September 20, 2004 a 1994 Dodge Spirit, bearing Michigan registration 09BMU and registered in the names of John and Jean Casselbury, was parked outside the SUBJECT PREMISES.

17

33.    Based upon the information provided by the Secretary of State, Time Warner Cable (Road Runner), LexisNexis, and the City of Menominee's Building Inspector's records there is probable cause to believe that the individual who used the IP address 24.208.39.42 on March 27, 2004 at 20:10:44 GMT +0100 is John A. Casselbury, who lives at the SUBJECT PREMISES.

34.    Based upon my own knowledge, experience, and training in child exploitation and child pornography investigations, and the training and experience of other law enforcement officers with whom I have had discussions, there are certain characteristics common to individuals involved in the distribution and collection of child pornography:

    a.    Child pornography collectors may receive sexual gratification, stimulation, and satisfaction from contact with children; or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media; or from literature describing such activity.

    b.    Collectors of child pornography may collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, video tapes, books, slides and/or drawings or other visual media. Child pornography collectors oftentimes use these materials for their own sexual arousal and gratification. Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

    c.    Collectors of child pornography almost always possess and maintain their "hard copies" of child pornographic material, that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home. Child pornography collectors typically retain

18

pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica,[3] and video tapes for many years.

     d.    Likewise, collectors of child pornography often maintain their collections that are in a digital or electronic format in a safe, secure and private environment, such as a computer and surrounding area. These collections are often maintained for several years and are kept close by, usually at the collector's residence, to enable the collector to view the collection, which is valued highly.

     e.    Child pornography collectors also may correspond with and/or meet others to share information and materials; rarely destroy correspondence from other child pornography distributors/collectors; conceal such correspondence as they do their sexually explicit material; and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

     f.    Collectors of child pornography prefer not to be without their child pornography for any prolonged time period. This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

35.    The undersigned affiant submits that there is probable cause to believe that John A. Casselbury, utilizing 906-864-0120 at 1512 24th Avenue, Menominee, Michigan, 49858 is a

---

[3] "Child erotica," as used in this Affidavit, is defined as materials or items that are sexually arousing to certain individuals but which are not in and of themselves obscene or do not necessarily depict minors in sexually explicit poses or positions. Such material may include non-sexually explicit photographs (such as minors depicted in undergarments in department store catalogs or advertising circulars), drawings, or sketches, written descriptions/stories, or journals.

collector of child pornography. This opinion is based upon the number of known child pornography images that John A. Casselbury had available in his shared folder on the FastTrack P2P network, specifically, 9 movies and 7 still images (See attachments A-G for still images).

36.     Finally, based upon the conduct of individuals involved in the collection of child pornography set forth above in paragraph 34, namely, that they tend to maintain their collections at private location for long periods of time, there is probable cause to believe that evidence of the offenses of receiving and possessing child pornography is currently located at the SUBJECT PREMISES.

## Specifics Regarding the Seizure and Searching of Computer Systems

37.     Based on my own experience and consultation with other agents who have been involved in the search of computers and retrieval of data from computer systems and related peripherals, and computer media, there are several reasons why a complete search and seizure of information from computers often requires seizure of all electronic storage devices, as well as all related peripherals, to permit a thorough search later by qualified computer experts in a laboratory or other controlled environment:

a.     Computer storage devices, such as hard disks, diskettes, tapes, and laser disks can store the equivalent of hundreds of thousands of pages of information. Additionally, when an individual seeks to conceal information that may constitute criminal evidence, that individual may store the information in random order with deceptive file names. As a result, it may be necessary for law enforcement authorities performing a search to examine all the stored data to determine which particular files are evidence or instrumentalities of criminal

20

activity. This review and sorting process can take weeks or months, depending on the volume of data stored, and would be impossible to attempt during a search on site; and

b.  Searching computer systems for criminal evidence is a highly technical process, requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even those who are computer experts to specialize in some systems and applications. It is difficult to know before a search what type of hardware and software are present and therefore which experts will be required to analyze the subject system and its data. In any event, data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to inadvertent or intentional modification or destruction (both from external sources or from destructive code imbedded in the system as a booby trap), a controlled environment is essential to its complete and accurate analysis.

38.  Based on my own experience and my consultation with other agents who have been involved in computer searches, searching computerized information for evidence or instrumentalities of a crime often requires the seizure of all of a computer system's input and output peripheral devices, related software, documentation, and data security devices (including passwords) so that a qualified computer expert can accurately retrieve the system's data in a laboratory or other controlled environment. There are several reasons that compel this conclusion:

a.  The peripheral devices that allow users to enter or retrieve data from the storage devices vary widely in their compatibility with other hardware and software. Many system storage devices require particular input/output devices in order to read the data on the

21

system. It is important that the analyst be able to properly re-configure the system as it now operates in order to accurately retrieve the evidence listed above. In addition, the analyst needs the relevant system software (operating systems, interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instruction manuals or other documentation and data security devices; and

b.       In order to fully retrieve data from a computer system, the analyst also needs all magnetic storage devices, as well as the central processing unit (CPU). In cases like the instant one where the evidence consists partly of image files, the monitor and printer are also essential to show the nature and quality of the graphic images which the system could produce. Further, the analyst again needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media) for proper data retrieval.

c.       I am familiar with and understand the implications of the Privacy Protection Act ("PPA"), 42 U.S.C. § 2000aa, and the role of this statute in protecting First Amendment activities. I am not aware that any of the materials to be searched and seized from the SUBJECT PREMISES are protected materials pursuant to the PPA. If any such protected materials are inadvertently seized, all efforts will be made to return these materials to their authors as quickly as possible.

<u>Conclusion</u>

22

39.    Based on the above information, there is probable cause to believe that 18 U.S.C. §§ 2252 and 2252A, which, among other things, make it a federal crime for any person to knowingly possess, transport or distribute child pornography, have been violated, and that the following property, evidence, fruits and instrumentalities of these offenses are located at the SUBJECT PREMISES:

   a.    Images of child pornography and files containing images of child pornography in any form wherever it may be stored or found including, but not limited to:

      i.    Any computer, computer system and related peripherals; tapes, cassettes, cartridges, streaming tape, commercial software and hardware, computer disks, disk drives, monitors, computer printers, modems, tape drives, disk application programs, data disks, system disk operating systems, magnetic media floppy disks, hardware and software operating manuals, tape systems and hard drive and other computer related operation equipment, digital cameras, scanners, computer photographs, graphic interchange formats and/or photographs, undeveloped photographic film, slides, and other visual depictions of such graphic interchange formats (including, but not limited to, JPG, GIF, TIF, AVI, and MPEG), and any electronic data storage devices including, but not limited to hardware, software, diskettes, backup tapes, CD-ROMS, DVD, Flash memory devices, and other storage mediums; any input/output peripheral devices, including but not limited to passwords, data security devices and related documentation, and any hardware/software manuals related to or used to visually depict child pornography or child erotica; contain information pertaining to the interest in child pornography;

23

and/or distribute, receive, or possess child pornography, or information pertaining to an interest in child pornography, child erotica or information pertaining to an interest in child pornography;

    ii.    Books and magazines containing visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256;

    iii.    Originals, copies, and negatives of visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256; and

    iv.    Motion pictures, films, videos, and other recordings of visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256.

    b.    Information or correspondence pertaining to the possession, or attempted distribution of visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256, that were transmitted or received using computer, some other facility or means of interstate or foreign commerce, common carrier, or the U.S. mail including, but not limited to:

    i.    Envelopes, letters, and other correspondence including, but not limited to, electronic mail, chat logs, and electronic messages, establishing possession, access to, or transmission through interstate or foreign commerce, including by United States mail or by computer, of visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256; and

    ii.    Books, ledgers, and records bearing on the production, reproduction, receipt, shipment, orders, requests, trades, purchases, or transactions of any kind

involving the transmission through interstate or foreign commerce including by United States mail or by computer of any visual depiction of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256;

      iii.    Credit card information including but not limited to bills and payment records;

      c.    Records evidencing occupancy or ownership of the premises described above, including, but not limited to, utility and telephone bills, mail envelopes, or addressed correspondence; and

      d.    Records or other items which evidence ownership or use of computer equipment found in the above residence, including, but not limited to, sales receipts, bills for Internet access, and handwritten notes.

This affiant requests authority to seize such material and specifically to seize the computer as an instrumentality of the crime.

    40.    Based upon the foregoing, this affiant respectfully requests that this Court issue a search warrant for the SUBJECT PREMISES, more particularly described in Attachment A, authorizing the seizure of the items described in Attachment B.

    41.    <u>Return of Items Not Contraband or Subject to Seizure Under the Warrant</u>. Computer storage media, videotapes, and other materials which are removed in order to conduct a thorough examination will be reviewed within a reasonable period of time, not to exceed six months, and if found not to contain contraband or evidence of illegal activity, will be made available for pickup by the owner.

42.     It is further respectfully requested that this Court issue an Order sealing, until further order of this Court, all papers submitted in support of this Application, including the Application, Affidavit, and Search Warrant, and the requisite inventory notice (with the exception of one copy of the warrant and the inventory notice that will be left at the SUBJECT PREMISES).  Sealing is necessary because the items and information to be seized are relevant to an ongoing investigation, and premature disclosure of the contents of this Affidavit and related documents may have a negative impact on this continuing investigation and may jeopardize its effectiveness.

_____

SA Jay D. Johnston
Federal Bureau of Investigations

Subscribed and sworn before me this _____ of September, 2004.

_____

Hon. Timothy P. Greeley
United States Magistrate Judge

26

## ATTACHMENT A

## DESCRIPTION OF PROPERTY TO BE SEARCHED

**1512 24th Avenue, Menominee, Michigan 49858**, to wit: a two story single family home, with gray vinyl siding and an attached single car garage. The numbers 1512 are written on the east side of the residence, near the front door. The residence has a pool in the back yard. There is also a 1994 Dodge Spirit, bearing Michigan registration 09BMU. Records of the Michigan Secretary of State indicates that the vehicle is registered to John and Jean Casselbury. The residence is located on the northeast corner of 24th Avenue and 16th Avenue, in Menominee, Michigan.

## ATTACHMENT B

## ITEMS TO BE SEARCHED FOR AND SEIZED

1.    Images of child pornography and files containing images of child pornography in any form wherever it may be stored or found including, but not limited to:

    a.    any computer, computer system and related peripherals; tapes, cassettes, cartridges, streaming tape, commercial software and hardware, computer disks, disk drives, monitors, computer printers, modems, tape drives, disk application programs, data disks, system disk operating systems, magnetic media floppy disks, hardware and software operating manuals, tape systems and hard drive and other computer related operation equipment, digital cameras, scanners, computer photographs, graphic interchange formats and/or photographs, undeveloped photographic film, slides, and other visual depictions of such graphic interchange formats (including, but not limited to, JPG, GIF, TIF, AVI, and MPEG), and any electronic data storage devices including, but not limited to hardware, software, diskettes, backup tapes, CD-ROMS, DVD, Flash memory devices, and other storage mediums; any input/output peripheral devices, including but not limited to passwords, data security devices and related documentation, and any hardware/software manuals related to or used to: visually depict child pornography; contain information pertaining to the interest in child pornography; and/or distribute, receive, or possess child pornography, or information pertaining to an interest in child pornography, or information pertaining to an interest in child pornography;

    b.    books and magazines containing visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256;

    c.    originals, copies, and negatives of visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256; and

    d.    motion pictures, films, videos, and other recordings of visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256.

2.    Information or correspondence pertaining to the possession or attempted distribution of visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256, that were transmitted or received using computer, some other facility or means of interstate or foreign commerce, common carrier, or the U.S. mail including, but not limited to:

    a.    envelopes, letters, and other correspondence including, but not limited to, electronic mail, chat logs, and electronic messages, establishing possession, access to, or transmission through interstate or foreign commerce, including by United States mail or by computer, of visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256; and

b.      books, ledgers, and records bearing on the production, reproduction, receipt, shipment, orders, requests, trades, purchases, or transactions of any kind involving the transmission through interstate or foreign commerce including by United States mail or by computer of any visual depiction of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256.

3.      . Records evidencing occupancy or ownership of the premises described above, including, but not limited to, utility and telephone bills, mail envelopes, or addressed correspondence.

4.      Records or other items which evidence ownership or use of computer equipment found in the above residence, including, but not limited to, sales receipts, bills for Internet access, and handwritten notes.